## CONKLIN *v.* CONKLIN.

1. DESCENT AND DISTRIBUTION—ESTATES OF DECEDENTS—NEXT OF KIN—STATUTES.

Children of a deceased first cousin of an intestate are not entitled to share in the estate with the first cousins, who are next of kin in equal degree, under the statutes of distribution.

2. WILLS—ESTATES OF DECEDENTS—UNDUE INFLUENCE- FIDUCIARY RELATIONS.

The relation of a confidential agent and physician having custody of a will and being present at the execution thereof and a legatee thereunder, raises a presumption of undue influence on his part.

3. COMPROMISE AND SETTLEMENT—ESTATES OF DECEDENTS—WILLS.

Legatees under a will, and persons having such an interest in the estate as to entitle them to contest the instrument, may make valid agreements to forbear a contest, and such contracts are favored by the law when made in good faith.

4. SAME—WILLS—PUBLIC POLICY.

But an attorney at law, having no interest in an estate, may not join with other relatives not next of kin in an agreement with beneficiaries under the will of decedent to withdraw all objections to it, to discourage any contest and allow the instrument to be probated, and to use their best efforts and testimony, if need be, to secure its admission to probate, having good reason to believe taht it was invalid.

5. SAME.

It is the tendency of such contracts, not what is done towards carrying them out, that the courts consider in determining whether they are opposed to public policy.

Appeal from Washtenaw; Kinne, J. Submitted March 2, 1911. (Docket No. 162.) Decided May 8, 1911.

Bill by Amariah B. Conklin, Mary L. Bailey, and Amariah F. Freeman against Ebenezer M. Conklin, personally and as executor of the estate of Mary A. Hitchcock, deceased, for specific performance of a written contract.

From a decree for complainants, defendants appeal.
Reversed, and bill dismissed.

*Robert E. Bunker* and *Arthur Brown*, for complainants.

*Thomas E. Barkworth* and *A. J. Waters*, for defendants.

BLAIR, J.   Mary A. Hitchcock died on the 18th day of
March, 1909, aged 70 years, leaving a paper purporting
to be her last will and testament, whereby she disposed of
her estate, consisting entirely of personal property, aggregating in value about $21,000.   The will was executed
September 13, 1907, and bequeathed to complainant Amariah Benjamin Conklin and seven other legatees $1,000
each; to two other legatees $500 each; to charitable and
beneficent institutions $500; to defendant Ebenezer M.
Conklin $7,000 and all the residue of her estate, appointing him executor of the will.   A prior will was executed
November 22, 1906, which differed from the second will
in including three legacies omitted from the second; in
specifying larger amounts as to two of the legacies; and
in the residuary clause, which was for the benefit of "all the
legatees above mentioned and to be divided in proportion
to the amount of their respective legacies."

Both wills contained a clause revoking all former wills.
Neither complainant Freeman nor his sister, complainant
Mary L. Bailey, were mentioned in either will, and were
not on friendly terms with the testatrix.   Complainants
and defendant Conklin were second cousins of testatrix,
who left surviving her 12 first cousins, all of whom lived
outside of this State, except two.

On March 24, 1909, defendant Conklin deposited the
will in the probate court, petitioned for its probate, and
April 20th was appointed by the court for hearing on the
petition.   Complainant Freeman testified that he and complainant Conklin, on or about March 30, 1909—

"Had a conference, and Mr. M. J. Cavanaugh was

sent for to act as attorney for us. Mr. Cavanaugh came over to my office in response to a telephone from me, and the result of that conference was that special administration was taken upon the estate, and that Mr. Cavanaugh was to go to Manchester to talk with Dr. E. M. Conklin, the defendant, and see if some adjustment could not be made respecting having Dr. E. M. Conklin give up some portions of his legacy to us as members of the Conklin family, so-called.

"*Q.* Some talk along the line of what subsequently appeared in this contract?

"*A.* Yes."

The negotiations begun by Mr. Cavanaugh were afterwards carried on by complainant Freeman in behalf of complainants, and proceeded throughout upon the express understanding that complainants were heirs at law of the testatrix, and as such were entitled to and, unless their demands were complied with, would contest the will, upon the ground that it was obtained by undue influence exerted by defendant Conklin. Complainant Freeman and defendant Conklin discussed the matter on April 6th, when Freeman made a proposition that he should have $1,000 for himself and $1,000 apiece for his two children; complainant Conklin should have $2,000 in addition to the $1,000 in the will; complainant Bailey should have $2,000 and an additional $1,000 for legatee Julia M. Conklin. This proposition was declined and further consideration postponed.

The negotiations proceeded from time to time; complainant Freeman insisting: "* * * There has got to be something done; * * * we must get together before the hearing day;" that the will could easily be broken; that the outside heirs were writing him and pressing him to take their case, and, unless the agreement went through, he should do so.

Defendant Conklin testified that complainant Freeman said: -

" If I made this agreement, he thought he could prevent a contest being brought; he was in communication

with some of the Winchesters, who were first cousins; had such relations with them that he thought they would do about what he advised in the matter, and thought he could control the Winchesters, and did not think very much about the cousins so far away as New York State, where some of them lived, or Pennsylvania; that there would be very much done on their part, and did not think there could be very much doubt but that he could suppress and discourage any one from bringing a contest, provided I agreed to the terms asked by him; we would work together to sustain the will.   *   *   *   He was urging me to hurry up, if I was going to do anything, and do it; if I was not, he wanted to get in on the other side."

On May 5th defendant Burtless purchased an undivided one-half interest in all gifts, legacies, and devises to E. M. Conklin, his wife, and son.   On the 8th day of May the parties came to an agreement, which was executed on May 10th, which contained, among other things, the following:

"That each of said named Conklin brothers and sisters are cousins of said Hitchcock, and, if no will were made, by nature, are equally entitled to the bounty or estate of said Hitchcock; she having at death no nearer relation, or heirs at law, than cousins, as next of kin.

"That Mary L. Bailey (née Freeman) and Amariah F. Freeman are sister and brother and cousins to said Conklin brothers and sisters, and also cousins to said Hitchcock, and, if no will were made, by nature, are equally entitled to the bounty or estate of said Hitchcock as are said Conklin brothers and sisters, said Bailey having a living son, Arthur Bailey, and said Freeman, a living son, Frank S. Freeman, and a living daughter, Emma L. Freeman, to neither of whom, nor their said children, is given any legacy by the terms of said will.

"That said A. Benjamin Conklin, said Mary L. Bailey, and said Amariah F. Freeman were about to enter contest and oppose the probate of said will of said Hitchcock, claiming that same is not in fact or law her will, and that it is rumored others, as her heirs at law or next of kin, also propose entering like contest, the claim also being put forth, in this connection, by said A. Benjamin Conklin, said Bailey, and said Freeman, that the distribution of the estate and property of said Hitchcock, as provided by

said alleged will, is neither equitable nor fair to them, nor is such disposition regardful of the relation existing by natural ties between said Conklin brothers and sisters, and between said Bailey and said Freeman, especially viewing the said amounts which will arise or belong to said E. M. Conklin by the terms of said will, if same shall be probated. * * *

" That said E. M. Conklin and said Freeman, representing said A. Benjamin Conklin, said Mary L. Bailey, and himself, have had several and extended conferences respecting the affairs of said estate and said will; that the respective situations have been thoroughly canvassed and the respective claims declared, discussed, and considered; and that, in consideration of all the relations here set forth and of all the matters known to them surrounding the said estate of said Hitchcock, that for the peace and good feeling in friendly family relation, that to avoid litigation and contest over the matter here referred to and to save the cost incident thereto, and that for compromise and settlement and by reason of the mutual agreements of the parties hereto, said E. M. Conklin, said A. Benjamin Conklin, said Bailey, and said Freeman have reached and entered into the following memoranda of agreement, as follows, viz. :

" That said A. Benjamin Conklin, said Bailey, and said Freeman shall withdraw all objection and withhold all proposed contest to the terms of said will and testament of said Hitchcock, and, so far as they are concerned, suffer and allow the same to be probated as and for the last will and testament of said Hitchcock, whereby, by the permit of court, said E. M. Conklin shall be and become the executor thereof, and whereby, likewise, the property of said estate shall pass to his possession and control, as to an ordinary general executor in such cases provided. And that they will also use their best influence, assistance, energy, and endeavor, and testimony, if need be, which may be thought competent or important, so far as they may truthfully be able to give this, in the support of said will and to discourage all contest respecting same, to the end that same be duly probated, as sought; and that this shall be without charge or compensation on their part, except as to said Freeman, as attorney, or one of them representing said estate of said E. M. Conklin as executor or legatee of said will, as hereinafter particularly set forth.

" That said E. M. Conklin shall pay to said A. Benja-

min Conklin the sum of $2,000, over and above the amount bequeathed to him by the terms of said will; that he shall also pay to said Mary L. Bailey the like sum of $2,000; and that he shall also pay to said Amariah F. Freeman the like sum of $2,000, or to their heirs, representatives and assigns, provided said will shall be duly probated by the courts invoked for that purpose; and that said respective sums shall become due and payable at any time after said will shall be duly and finally probated, and after the claims and accounts, if any, are lawfully established against said estate, or, if none are presented, then after the time allowed by law when such claims and accounts, if there were such, should be presented and allowed."

Objections were filed to the probate of the will by Henry Hitchcock and three others, which were disallowed, and an order entered, admitting the will to probate September 3, 1909. From the order admitting the will to probate, an appeal was taken to the circuit court on the 27th day of October, 1909, by Charles H. Winchester—

"As next of kin and one of the heirs at law of said deceased, and your petitioner further appealing shows that he is attorney in fact for S. Edward Hitchcock, Mary Kuder, Charles Hitchcock, and George Hitchcock, administrator, who are also interested in said estate, and also in behalf of all the other heirs of said deceased."

This appeal was later discontinued upon payment to Winchester of $3,000 by defendants. On August 3, 1909, defendant Conklin served notice that he repudiated the agreement. In January, 1910, complainants filed this bill of complaint for a specific performance of the agreement.

Complainants made the basis of their demand for a share of defendants' legacies the claim that there was no valid reason why the testatrix should have discriminated between the defendant Conklin and them, and, except for the undue influence exercised by Dr. Conklin, they would have shared equally with him. The circuit court made a decree in favor of complainants, from which defendants have appealed to this court.

The appellants contend that there is no valid consideration to support the contract, and it is therefore invalid and unenforceable for the following reasons:

*First.* The subject-matter of the contract, namely, the right of complainants to contest the will, did not exist, and there is no contract where there turns out to be no subject-matter.

*Second.* Part of the consideration in the instrument is clearly illegal.

*Third.* Part of the consideration being illegal, the contract fails.

*Fourth.* The entire agreement is against public policy.

*Fifth.* The agreement was champertous.

Complainants contend:

(1) That defendants' laches estop them from their defense.

(2) That the common belief that the parties were heirs at law was a mistake of law and furnishes no basis for relief, in accordance with the maxim, "*Ignorantia legis neminem excusat.*"

(3) That the interest of complainant Conklin under the first will referred to entitled him to make a contest, which inured to the benefit of his co-complainants; that the agreement to pay the expenses of the special administration and to pay one-half of the claim of one O'Neil, if allowed, and for the "services of the law firm of A. F. & F. M. Freeman in Conklin's attempt to probate this will," the compromise of opposing claims made in good faith, and other agreements set forth in the contract, furnished an abundant consideration for the contract; that the contract is not against public policy, but, on the contrary, "if there is one thing which, more than another, public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice."   L. R. 19, Equity Cases, p. 462.

We first consider the objection that the agreement was in contravention of public policy. This question is to be determined in the light of the relations of the parties to the subject-matter, and the circumstances surrounding

and leading up to the execution of the contract. The complainant Freeman, who was the active representative of the complainants in negotiating the agreement, took nothing, if the will was sustained; neither did his sister. If the will was set aside and the estate distributed as intestate estate, each of the complainants, as well as the defendant Conklin, would take not to exceed $500, provided they were entitled to share in her estate under the statutes of distribution, as they all believed they were.

As a matter of law, if the estate were to be settled as an intestate estate, none of the parties to this suit had any interest in it whatever; but the entire estate would have gone to the first cousins; they being "the next of kin in equal degree." *In re Klein's Estate*, 152 Mich. 420 (116 N. W. 394).

The complainants believed, and had good reason to believe, that the will was obtained by defendant Conklin by undue influence, and, in the language of the circuit judge,

"It is difficult to understand why the defendant Conklin made this contract, except upon the theory that he doubted the validity of the will and feared the result of the contest."

Defendant Conklin was the physician of testatrix, as well as a relative. In the course of the negotiations, he admitted to complainant Freeman that, while testatrix was not absolutely incompetent to make a will, her mind was weakened, so that she could be easily influenced; that one Keeler and one Hitchcock had so influenced her against them both, that "she got wise after a while and fired Hitchcock," and sent for defendant Conklin; that he had a power of attorney to do business for her.

"I said to Dr. Conklin, 'It is rumored about—it seems to be public property—that Mary has made several wills.' He said, 'Yes, I have heard about it, too; that she made some up at Sharon.' I asked, 'How many did she make here that you know of?' 'Why, she made two while she was in Manchester. A short time after she came down, she wanted to make a will and talked with me about it.' He

said another was made a short time after she came down. * * * I said, ' Doctor, how much have you got out of this estate, either by way of a gift from Mary Hitchcock, or by way of a loan from her which does not show up in the assets of the estate, from the time that she came down to Manchester to the time of her death ? ' He hesitated considerably. I said, 'What have you to say ? ' He said, ' I don't have to answer.' I said, ' I guess that is so.' * * * I said to him, ' Now, what reason have you that Dr. Ben's children should not have as much as Sophia and her children ? ' He said, 'If it had not been for me, they would not have had anything.' I said, 'What do you mean by that ? ' He said, ' When Mary made up her mind how much she wanted to go into the will, and the persons, she did not have Dr. Ben named for anything, and I said to her that he was a member of the family and ought to have as much as Julia or Sophia. Upon that he was put in.' To that I replied, ' Yes, indeed;' I used that expression."

Defendant Conklin testified that he was present when both wills were made; saw the memoranda made by her for the drafts thereof, before they were delivered to the draftsman; was the custodian of all of her property, and of the two wills, and retained the first will in his possession, and still had it. The relations of defendant Conklin to testatrix raised a presumption of influence which would call for explanation on his part. *In re Bromley's Estate*, 113 Mich. 53 (71 N. W. 523); *Cooper* v. *Harlow*, 163 Mich. 210 (128 N. W. 259).

Upon the facts disclosed by this record, we think Mr. Freeman was well within the probabilities in representing to defendant Conklin that a successful contest of the will could be made upon the ground of undue influence. Throughout the negotiations and in the executed agreement, complainants based their right to contest the probate of the will upon their rights as next of kin, and Mr. Freeman, who represented them, fully understood that the defeat of the last will would naturally carry with it the defeat of the preceding will. Whatever may be the rule as between the parties, in determining whether this

contract is against public policy, we think the court should consider the relations of the parties in their true legal aspect, regardless of mutual mistakes of law, and should be guided by the legal effect of their agreement.

The public policy of the State as to the descent and distribution of the estate of a deceased person is clearly defined by our statutes and the decisions of our courts. In case of a valid will, the law commands that the estate shall be distributed in accordance with its terms.

In case of an invalid will, because not the product of a free and disposing mind, but the result of undue influence, the law commands that the estate shall be disposed of as intestate estate. In either event the law considers primarily the rights of the testator, first, to dispose of his entire estate according to his own free will; second, to be protected in his weakness against fraud and undue influence.

We have no doubt that all of the parties in interest in the estate may dispose of the estate by agreement contrary to the terms of the will, and individual legatees may deal with their legacies as they see fit; and persons having interests in the estate, sufficient to entitle them to contest the will, may make valid agreements to forbear a contest. In fact, the law favors such contracts, when made in good faith. But in the case at bar the principal negotiator and his sister had no interest whatever in the estate upon any theory, and it was agreed among them that the settlement must include all three.

Complainant A. B. Conklin testified:

" I don't recall that I personally participated in the negotiations with Dr. E. M. Conklin at any time. I learned of it through Mr. Freeman by word of mouth, I think.  *  *  *  I supposed that I was an heir of Mary Hitchcock at that time. I proceeded with the contract on the assumption that I had a claim against the estate as an heir at law. I was never during the entire negotiations advised differently.  *  *  *

"Q. Did you discuss with Mr. Freeman the effect of breaking the will upon you yourself ?  *  *  *

"*A.* In what way?

"*Q.* As to whether you would gain or lose by breaking that will.   *   *   *

"*A.* Yes, sir.   According to my own figuring, I could figure that out; that I would not get as much by breaking the will, as under the will.   I demanded $2,000 of Dr. Conklin as a matter of right.   I explained it this way:   I couldn't get it through my head that because my brother lived at Manchester and lived nearer to her than I did, and did a few little things that I did not do, and by relationship was no nearer to her than I was, I did not—it did not satisfy me that that gave him a right in equity to receive from the estate of Mary A. Hitchcock $14,000 into his family and $1,000 into mine.   *   *   *

"*Q.* So that you were endeavoring by your contract to secure a disposition of property which would cut off first cousins under the provisions of that will?

"*A.* Yes."

Having these things in mind, we turn to the consideration of the contract.

The complainants agreed therein to—

" Withdraw all objection and withhold all proposed contest to the terms of said will, and *   *   * suffer and allow the same to be probated.   *   *   * And that they will also use their best influence, assistance, energy, and endeavor, and testimony, if need be, which may be thought competent or important, so far as they may truthfully be able to give this in the support of said will, and to discourage all contest respecting same, to the end that same may be duly probated as sought."

That said complainants should be paid $2,000 each, "provided said will shall be duly probated by the court invoked for that purpose; and that said respective sums shall become due and payable at any time after said will shall be duly and finally probated," etc.

It is apparent that this is not a mere agreement to forbear to contest the will and to permit its allowance, but is a positive agreement to endeavor, by energetic efforts, to procure the probate of a will which they believed, and had good reason to believe, was not entitled to probate, in order to secure a disposition of property which would

cut off first cousins. Furthermore, they not only agreed to actively assist in procuring the probate of the will, but they agreed "to discourage all contest respecting same." And upon the success of their efforts to probate the will and to discourage contests depended their compensation. The agreement to discourage contests related naturally to the next of kin, to whom the entire estate would descend in case of a successful contest, and was of the essence of the contract, so far as defendant Conklin was concerned.

It is the tendency of such contracts, and not what is done towards carrying them out, that the courts consider in determining whether they are opposed to public policy. Viewed from this standpoint, this contract cannot stand. Its tendency was to defeat the ends of justice by furnishing one of the most powerful of human motives to suppress the truth, in so far as it tended to defeat the will; to exaggerate and color facts tending to support the will; to resort to deceit and misrepresentations to discourage contests; and, finally, to endeavor with all their might to induce the courts to determine a will to be valid which they believed to be invalid. *Thomas* v. *Caulkett*, 57 Mich. 392 (24 N. W. 154, 58 Am. Rep. 369); *Sherman* v. *Burton, ante*, 293 (130 N. W. 667).

In view of the foregoing, it becomes unnecessary to consider the other questions discussed in the briefs.

The decree is reversed, and the bill dismissed.

OSTRANDER, C. J., and MCALVAY, BROOKE, and STONE, JJ., concurred.