## In re HARTLERODE'S ESTATE.

### HARTLERODE *v.* THOMAS.

1. EVIDENCE—ESTATES OF DECEDENTS—STATEMENTS OF TESTATOR —WILLS—HEARSAY—UNDUE INFLUENCE.

On the trial of a will contest, testimony of a daughter of decedent that her mother stated during her lifetime that the minister of a church to which the deceased left a considerable portion of her estate by will had told testatrix that she ought to leave something to the church and to him, was admissible in support of a claim of undue influence.[1]

2. WILLS—UNDUE INFLUENCE—PRESUMPTIONS.

Where testatrix devised her entire estate to her husband for life, and granted to her daughter one-half of the estate after his death, bequeathing to a church the re-

[1] On the question of ante-testamentary declarations as evidence of undue influence, see note in 3 L. R. A. (N. S.) 749.

maining half, and directing, in case of the death of her daughter before the death of testatrix, that the rector of the church should have the portion which was to be left to the daughter; that in the event of the death of both daughter and rector her property should become the property of said church, also, where it appeared that she had no acquaintance with the rector or his church until a few weeks before she executed the will, which revoked one wherein she disposed of her estate to the natural objects of her bounty, and that the rector called on her frequently before her decease and she was, during that time, weak and easily influenced, raised a presumption of undue influence that should have been rebutted by evidence, and presented an issue of fact.[1]

Error to Berrien; Bridgman, J. Submitted June 19, 1914. (Docket No. 56.) Decided October 3, 1914.

Charles Hartlerode presented for probate an instrument purporting to be the last will of Elizabeth Hartlerode, deceased, and it was admitted to probate in the probate court. Winifred Thomas appealed to the circuit court. Judgment for proponent on a directed verdict. Contestant brings error. Reversed.

*Cady & Andrews*, for appellant.

*Gore & Harvey*, for appellees.

STONE, J. The principal question involved in this case is: Were certain provisions contained in the will of Elizabeth A. Hartlerode, deceased, procured by and through undue influence?

The will in question bears date February 19, 1913. The pertinent provisions are as follows:

"*First.* I will and bequeath to my beloved husband, Charles Hartlerode, Sr., all my real estate, including our home, situated in the county of Berrien, township

---

[1] As to the undue influence of the draftsman or person active in procuring execution of will, see note in 28 L. R. A. (N. S.) 270.

of Pipestone, in the State of Michigan, and all my personal property during his life.

"*Second.*  At the death of my said husband, it is my will and wish that one-half of my personal property and one-half of my real estate shall go to and vest in Winifred Thomas, wife of William Thomas, of Chicago, and that the balance of my said personal property and real estate shall go to, and become the property of St. Alban's Episcopal Church, now located at No. 4338 Prairie avenue, Chicago, Illinois.

"*Third.*  In case of the death of the said Winifred Thomas, prior to my death, or prior to the death of my said husband, it is my will and wish that the one-half of my real and personal property herein above willed to her, shall go to and become the property of Charles Kenneth Thomson, now rector of the said St. Alban's Episcopal Church.

"*Fourth.*  It is my will and wish that in case of the death of both the said Winifred Thomas and the said Charles Kenneth Thomson before my death, or before the death of my said husband, then all of my property, both real, personal and mixed, shall go to, and become the property of the St. Alban's Episcopal Church.

"*Fifth.*  I nominate and appoint my said husband, Charles Hartlerode, my executor."

The said husband was the proponent of the will. Numerous objections to the probate of this will, including undue influence, were filed in the probate court by Winifred Thomas, daughter of deceased, but no contest was really made in that court, and the will was there admitted to probate.  Contestant appealed to the circuit court, and there gave formal notice that on the trial she would only attack the provisions and bequests in said will, giving certain property of deceased to the St. Alban's Episcopal Church, located at No. 4338 Prairie avenue, Chicago, and Charles Kenneth Thomson, rector of said above named church.

At the trial in the circuit court, at the close of the testimony, the court directed a verdict and judgment for the proponent, and the will was admitted to probate.  Contestant has appealed, and the principal con-

tention is that there was a question for the jury upon the subject of undue influence. In stating the case the contestant's evidence is to be considered in its aspect most favorable to her; for, if, in giving contestant's evidence its strongest probative force, it was sufficient, unexplained, to support a verdict, then she was entitled to have the case submitted to the jury.

Contestant's evidence tended to show that decedent came from England to this country a number of years ago, locating in Chicago, where she followed the occupation of a nurse, and, after residing there for a number of years, she went to Berrien county, Mich., where she married Charles Hartlerode in 1900. They lived upon a farm in Berrien county during the whole of their married life until she went to Chicago, as hereinafter stated. Mrs. Hartlerode contracted pulmonary tuberculosis, from which she died April 17, 1913. Contestant is the only child of decedent, and has been for a number of years living in Chicago. Decedent, on the 21st of September, 1912, went from her home in Berrien county to Chicago for the purpose of obtaining medical treatment, took apartments with contestant, and remained with her until January 14, 1913. For the purpose of accommodating her mother, contestant was obliged to move to a house with additional rooms, which she did. Contestant was married in 1894, and, after some domestic differences, she and her husband separated January 14, 1913. Prior to their separation it was arranged between decedent and contestant that they were to occupy rooms together, but decedent afterwards concluded that would be too much of a burden for contestant to assume, so she made an arrangement to, and did, go to room with a Mrs. Brock, who resided in premises adjoining those decedent had occupied while staying with her daughter and son-in-law.

Rev. Charles Kenneth Thomson was the rector of

St. Alban's Episcopal Church, which church is situated in the vicinity of Mrs. Brock's premises. Mrs. Anna Cragg is a member of the Episcopal Church, and was the wife of a deceased brother of Mrs. Hartlerode. Decedent was not a member of any church, and had never seen the St. Alban's Church building, and had never seen the Rev. Thomson until he made a call upon her while she was living with contestant. He called upon her at the request of Mrs. Cragg for the first time about the middle of October, 1912, and continued his visits until decedent went to a hospital on March 10, 1913. Decedent was confirmed as a member of St. Alban's Episcopal Church the day before she was taken to the hospital.

From the time decedent went to Chicago for medical treatment she gradually failed until her death, at the date above stated. She was weak, changeable, and easily influenced.

Decedent, just prior to the signing of the will in question, was the owner of 21 acres of land in Berrien county, which was subject to a life estate of her husband, and she was also the owner of personal property, including three notes, aggregating about $700. The real estate was worth from $1,000 to $1,200, and the personal property, outside of the promissory notes, only amounted to a few dollars. Mr. Ayres, an attorney, who drew the will in question, was a witness for proponent, and testified that he was called over the phone and requested to draw the will; that he did not know who called him, but it was not Rev. Thomson; that in accordance with the request he called, but did not draft the will until he had called there three or four times; that upon his arrival he found Mr. and Mrs. Hartlerode alone; that he talked with them at length about the proposed will, and about the deed which she had from her husband, and advised that the husband deed absolutely to her, as there was some

question in the mind of the attorney about the validity of the deed. Later, upon being notified, he drew a deed from the husband to decedent and a will like the one signed, except that it referred to contestant as her daughter. Decedent objected to signing it on account of such reference, and the will was redrafted, eliminating such reference. Rev. Thomson visited decedent the day the will was taken to her for her signature.

Just prior to going to Chicago, decedent, in September, 1912, had made a will giving all of her property to contestant (subject to a life estate in her husband), except that she thereby gave $350 to one Alonzo Asel, a boy that decedent and her husband had taken from the Children's Home at Coldwater. On February 18, 1913, on the advice of the attorney aforesaid, Mr. Hartlerode gave an absolute warranty deed to decedent covering the 21 acres of land, and on February 19, 1913, while decedent was confined to her bed, she signed the will in question. The attorney made no charge for his services. Two of the witnesses to the will were members of St. Alban's Episcopal Church, and had called on decedent frequently prior to the time she was removed to the hospital. Neither the Rev. Thomson nor either of the witnesses to the will called to see decedent after she was removed to the hospital. The contestant visited her mother every day while she was living with Mrs. Brock, and called nearly every day while she was at the hospital. Contestant was not present when the will in question was signed. Upon the trial Mrs. Brock, among other things, testified as follows:

"Q. Did she ever say anything regarding Mr. Thomson in connection with the will?
"A. Not at that time; no, sir.
"Q. Did she later?
"A. Only to the effect that Mr. Thomson having

called, and not having—her not having sufficient money that she could give him, or pay for his trouble, he thought it was no more than right that she should donate some of her property, should she have any, to the church.

"*Q.* How long was this after she came to your house that she began talking about that?

"*A.* About four weeks.

"*Q.* Did she talk about it more than once?

"*A.* Well, that was somewhere around in February some time, and then she told me she was having a new will drawn up, and through Rev. Thomson she had secured a lawyer who would draw up the new will, and in that way—she didn't tell me the contents of the will, but she told me the will was changed, in which Mrs. Thomas would not get the full amount of the will.

"*Q.* Did she say why that change was made?

"*A.* Only as I said, that she thought that—the minister thought that they ought to get some of the money as long as they—she was going to be a member of the church.

"*Q.* Did she say anything to you about what it cost her to have the will drawn?

"*A.* She told me the lawyer who drew up the will, his charges were usually $25, but as a favor he would charge $10, and then she said that he charged her nothing, being a friend of Rev. Thomson.   *   *   *

"*Q.* Were you at home the day they came to draw the last will?

"*A.* Yes, sir.

"*Q.* Do you know whether or not Mr. Thomson was there that day?

"*A.* He was there; yes, sir.

"*Q.* Do you know whether or not he talked with Mrs. Hartlerode?

"*A.* Yes, sir; he did, in my room, which happened to be my parlor. He was there not more than ten minutes."

This witness also testified that decedent told her that she always preferred seeing Mr. Thomson alone, and that she did so.

Contestant testified in part as follows:

"I am not personally acquainted with Rev. Charles Kenneth Thomson, but I let him in my house on his first visit to see my mother. My mother did not know he was coming; thought at the time that he was a traveling salesman. He told me he was an Episcopal preacher, and had been sent there by Mrs. Anna Cragg. I think he called there about eight times to see my mother at my place. I think he was there three times in the daytime, and the other times he would come just before I would leave for my work, so I don't know how long he would remain. Mrs. Anna Cragg is a sister-in-law to my mother; married my mother's brother, who has been dead for several years. Mrs. Cragg was only at my house twice to see my mother, to my knowledge. My mother talked with me about her property when she first came to my house. She told me she had made a will in Benton Harbor, and had left the bulk of her property to me, with the exception to Alonzo Asel, a boy she took out of the orphans' home in Michigan. After that my mother told me that she might change it in favor of my husband; that she would give the property equally to my husband and myself, provided we live together. She asked me if I was willing, and I told her I was. She told me up to the time she left my house, that she had left everything to me, with the exception of a little money to that boy. After she left my house she talked with me one day about Rev. Thomson, and said she didn't know how to repay the minister for his visits, and said, 'Of course you know, Daughter, ministers, as a rule, expect a little fee every time they call,' and of course I didn't know that, and she said, 'I am not able to pay that fee,' and she said—he said —the minister said to her that she really ought to leave something to the church, and she said, 'I don't know what to do about it.' She said that he said he ought to be left something and also the parish; that is what she told me."

Mr. Hartlerode, husband of decedent, was sworn in behalf of proponent and legatees, and on his direct examination testified as follows:

"*Q.* Did your wife explain to you why she wanted

to give a portion of this property to St. Alban's Church?

"*A.* Well, she thought they had helped her on the road to God, you might as well say.

"*Q.* Did she ever tell you that Rev. Thomson had asked her for any property?

"*A.* No, sir."

There seems to be no question that a confidential or fiduciary relation existed between decedent and the Reverend Mr. Thomson. It is the claim of appellant that, this confidential relationship having been established, a *prima facie* fact of undue influence was proven, without proof of any additional facts, which fact required proof on the part of proponent to overcome, and the weight of the testimony, both for and against, was for the jury.

Mr. Thomson was not sworn in the case. It was competent, under our rulings, to admit evidence of statements made by decedent, at and about the time she made the will, as to the conduct of a legatee. *In re Foerster's Estate*, 177 Mich. 574-587 (143 N. W. 616).

Taking into consideration the significant facts that decedent, up to within a few weeks of the making of the will in question, was an entire stranger to both St. Alban's Church and its rector, that she willed to them a substantial part of her property, thus changing a former will, in which she had disposed of the same to the natural object of her bounty, did not the duty then devolve upon the legatees to explain the circumstances in such a manner as to exonerate them from the use of undue influence? St. Alban's Church could only act through its agents or representatives. The Reverend Mr. Thomson stood in that relation, and whether the property was willed to him personally, or to the church which he represented, was he not called upon here to show that the presumption of undue influence should not prevail under the circumstances of

the case? In other words, was not the contestant, in the state in which the evidence left the case, entitled to have it submitted to the jury? There are certain cases in which the law indulges in the presumption that undue influence has been used, as where a patient makes a will in favor of his physician, a client in favor of his lawyer, or a sick person in favor of a priest or spiritual adviser, whether for his own personal advantage, or for the advantage of some interest of which he is a representative. This rule has been recognized and applied by us.

In *Re Bromley's Estate,* 113 Mich. 53 (71 N. W. 523), the jury was charged as follows:

"Where a person devises his property to one who is acting at the time as his attorney, either in relation to the subject-matter of the making of the will, or generally, during that time, such devise is always carefully examined, and of itself raises a presumption of undue influence. But this is by no means a conclusive presumption, but it is one that may be overcome by evidence."

This court, in affirming the judgment, said:

"We think the charge, as a whole, correctly indicated to the jury that the burden does rest upon the proponent to overcome the presumption that arises from the confidential relation."

In *McPherson* v. *Byrne,* 155 Mich. 338 (118 N. W. 985), where defendant, a priest, claimed to be the owner of certain certificates of deposit, as a gift from deceased while she was *in extremis,* this court, in referring to the confidential relation, stated:

"That the burden of proof in such a case as this rests upon the one occupying a confidential relation is clearly settled by the authorities. See *In re Bromley's Estate,* 113 Mich. 53 [71 N. W. 523]; *Ross* v. *Conway,* 92 Cal. 632 [28 Pac. 785]."

To the same effect are *In re McMaster's Estate,* 163

Mich. 210 (128 N. W. 259) ; *Conklin* v. *Conklin,* 165 Mich. 571 (131 N. W. 154). In the last-cited case Justice BLAIR, speaking for the court, said:

"The relations of defendant Conklin to testatrix raised a presumption of influence which would call for explanation on his part."

The case of *Ross* v. *Conway, supra,* is worthy of examination on this subject.

We are of opinion that enough was shown by contestant to raise a presumption of undue influence, which was not overcome by evidence, and that the question should have been submitted to the jury, under proper instructions. As the case must go back for a new trial, we would say that we think that the trial court should have permitted the answers to the questions asked of Dr. Moore to have been read to the jury. This deposition had been taken in Chicago. While other answers which were permitted to be read render the answers objected to somewhat unimportant, yet we think they were unobjectionable.

We find no other errors in the record.

The judgment of the circuit court is reversed, and a new trial granted.

McALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.