## TAPIN *v.* KRAMER.

CANCELLATION OF INSTRUMENTS—DEEDS—ESTATES BY ENTIRETIES—UNDUE INFLUENCE — MENTAL INCOMPETENCY — HUSBAND AND WIFE.

In suits by a wife's brothers and sisters, commenced after her death, to set aside, on grounds of undue influence, mental incompetency and fraudulent inducement, deeds by which, six years previous to her death, her property, inherited from her first husband, was conveyed to herself and second husband as tenants by the entireties, the decree of the court below dismissing the bills is affirmed by an equally divided court.

Appeal from Wayne; Codd (George P.), J.    Submitted January 21, 1926.    (Docket Nos. 5, 6.)    Reargued April 19, 1927.    Decided May 3, 1927.

Bills by Philip H. Tapin and others and John L. Tapin and another against Anthony Kramer to set

Appeal and Error, 4 C. J. § 3113; Husband and Wife, 30 C. J. § 313.

aside certain deeds.    The cases were consolidated. From a decree dismissing the bills, plaintiffs appeal. Affirmed by an equally divided court.

*Lucking, Hanlon, Lucking & Van Auken* and *Younglove & Chockley* (*William Lucking* and *Lyle Younglove*, of counsel), for plaintiffs.

*Colombo, Colombo & Colombo*, for defendant.

STEERE, J.    These two suits being identical in purpose and substantially alike in pleadings were, by consent of parties and order of court, consolidated and heard together.    The seven plaintiffs are brothers and sisters of defendant's deceased wife, Arline Kramer, née Tapin, but formerly married to a man named Louis E. Van Hoffman, who died in May, 1915, at his home in Detroit, leaving her his estate valued at many thousands of dollars.    On September 12, 1916, she married defendant, who was a widower with several children.    Between four and five months later, on January 31, 1917, she deeded to one Edwin R. Monnig all her real estate in the city of Detroit, alleged in the bills and admitted in the answers to have a value in excess of $50,000, and joined with defendant in deeding a lot of his of comparatively small value to Monnig, who promptly deeded the properties back to them as husband and wife holding by entireties.    He only figured in the transaction as a title conduit to effect that result.    She died in January, 1923, without issue by either husband.    Following her death, plaintiffs, as her heirs, instituted these proceedings to obtain cancellation of the deeds she so gave on the grounds of undue influence, mental incompetency, and fraudulent inducement.    The court dismissed plaintiffs' bills at the close of their testimony on defendant's motion, and they have appealed.

As these cases come to this court, the only testimony

we have before us is that produced by plaintiffs. The defense interposed was of a technical type, based entirely on propositions of law. First, when the case was called, by an oral motion to dismiss plaintiffs' bills, which was properly denied, followed, as the hearing progressed, by various untenable objections against and motions to strike out plaintiffs' testimony, and when they rested defendant was content to rest the case on a motion in the nature of a demurrer to their testimony for dismissal of their bills. The inadvisability of that method of trying a suit in chancery, which on appeal must be heard *de novo* on the record made in the court below, is illustrated by many statements of claimed facts in defendant's brief without reference to pages where found and for which we search the record in vain. Typical of this, it is said in his counsel's brief:

"The defendant and appellee contributed two parcels, a corner at Gratiot avenue near Seven Mile road and the Seyburn avenue home worth approximately $20,000. He and the decedent later sold the Gratiot avenue corner for $5,000."

The record only discloses defendant contributed the lot on Gratiot avenue near Seven Mile road. A witness named Keys, familiar with that subdivision, who qualified and testified to values of realty in that locality, said that when the property was subdivided and put on the market front lots in that subdivision were sold for $1,500, and in his opinion they had increased in value about $300 or $400 since. Asked, on cross-examination, if he knew Mr. Kramer sold that lot in June, 1916, for $5,000, he replied, "I don't know it." The so-called "Seyburn avenue home" is shown to have been defendant's home where he resided with his family, and to which he took deceased when they returned from their honeymoon trip. Whatever the facts may be, the record fails to disclose that he ever owned it or conveyed it to any one.

Plaintiffs' testimony showed that in this transaction deceased conveyed to Monnig by three separate deeds property in three locations. One, including the southwest and northwest corners of Forest and Mt. Elliott avenues, another covering property in the subdivision of part of the Meldrum and Beaufait farm north of Jefferson avenue, and a third conveying lot 326, Boulevard Park subdivision of part of private land claim 16, between Waterloo street and Mack avenue. These with the buildings upon them were appraised at considerably above $200,000 by the testimony of expert witnesses familiar with prices of property in those localities.

It appears from the testimony that when her first husband died there was some contest over his estate, in the settlement of which she counseled with and was represented by an attorney in the Majestic building named Devine. On several occasions when waiting in his office to see him she told his stenographer that her income from the property Van Hoffman left her was approximately $1,500 per month, and when the estate was finally closed she told her that she intended to make a will leaving her property to her sisters. There is other testimony to like effect as to the income of the property and that she said more than once she intended to leave her estate to her brothers and sisters.

Deceased's first husband, Van Hoffman, was for many years engaged in the grocery and saloon business at the corner of Forest and Mt. Elliott avenues, living with deceased in rooms over his store. She worked with him in his business both in his store and saloon, and substantially aided him in the accumulation of his property, the great value of which, however, resulted from the growth of Detroit and increase in value of his real estate. Soon after his death she requested her sister Clara Lampson and husband to move to her

home over the store at the corner of Forest and Mt. Elliott and live with her, which they did. While they lived there Lampson assisted her in caring for her property, collecting rent, looking after repairs, etc. They remained there until shortly after her marriage to defendant, who then looked after the property and collected the rent. On return from their honeymoon trip, which lasted about a month, she went to live with defendant and his children at his home on Seyburn avenue and continued to do so until her death. She had always been very friendly with her brothers and sisters, visiting with them back and forth, making them and their children presents, at times helping some of them financially, and so continued until about the time she executed the conveyances in question. Previous to that time she had purchased under contract a house and lot on Maxwell avenue for $3,700 and paid all but about $1,900 on it, intending, as she said, that she would give it to her sister Clara Lampson and husband for the many little favors they had done her. She made some payments on it after her marriage, and, on June 27, 1917, assigned it to them, stating that she was sorry she could not do as she had said in regard to paying for it, but they must thereafter keep up the payments until such time as she could, and would, help them out.

As bearing upon deceased's mental and physical condition approximating the time she executed the deeds in question, it was shown that in the latter part of December, 1916, she was stricken with a serious attack of erysipelas, most acutely over her face and neck but also involving her shoulders and arms. A practical nurse of experience, named Mrs. Lillian M. Chilton, was employed to care for her. She testified to having previously met deceased and when called to her home shortly after the holidays in 1917 she

found her very sick, suffering from erysipelas, with which witness was familiar; her neck, which was nearly straight with her face, and her face, were so swollen and discolored that she was scarcely recognizable. Mrs. Chilton remained in attendance on her about three weeks and left, as she said, principally because in connection with her mental disturbance "she was more than I could handle;" that when her temperature was highest and she was suffering the most she would become actively delirious, out of her mind, insisting on getting out of bed, following witness around, talking wild and irrationally and difficult to pacify or control. On one occasion deceased's husband told her some kind of a "healer" would be there that day, describing him as "uncouth" and to allow him to go up to Mrs. Kramer's room when he came. The "healer" came about noon. He had a long beard, spoke English poorly and impressed witness as very uncouth. When she led him to Mrs. Kramer's room he proceeded to pull down the shades and wanted to close the door which witness did not permit but stood in the door while he conducted his healing operations. His ministrations, as she observed them, consisted of gesticulations with his hands, passing them over Mrs. Kramer's face, saying nothing she could understand but with a "kind of grumbling." As to results, she said the patient was "kind of restless before and afterwards she got composed. She did not speak for quite a while after." Of the patient's condition during the time she was there, witness said "She had a temperature during this period of three weeks. This condition of her face and neck lasted all the time I was there; she was very little better when I left." She received her pay from defendant at the end of each week while she was there, and said she was paid three times. She was somewhat uncertain about dates, but gave January 21, 1917,

as a date when she was there, and said, "She seemed a little weaker when I left than when I came."

We have no direct proof of the attending circumstances or of deceased's condition at the time of the execution of the deeds in question. The deeds which she executed were all dated before the end of January, 1917, and recorded about the middle of February, 1917. It was the opinion of the trial court that no undue influence, coercion, unfair or fraudulent conduct on the part of defendant, or mental incompetence of deceased at the time of executing the deeds, was shown; that they were presumptively valid, and plaintiffs having failed to even make out a *prima facie* case, it was incumbent on the court to dismiss their bill.

We are not advised of the ages of any of the parties to this litigation. It is fairly inferable from the record that they were all adults of mature years and some past middle life. Deceased's sisters were all married, some at least had children, and she had been married to a husband whom she assisted for many years in his retail grocery and saloon business, and who during that time had accumulated a fortune, which he left to her. Her business experience and ability, so far as shown, was limited to housekeeping and helping him in and around his grocery and saloon. She is not shown to have had any experience in dealing with real estate or to have acquired any property except that left her by her first husband. Defendant's calling, previous career, and financial circumstances are not shown beyond the facts that less than a year and a half after her first husband died and not long after his estate had been settled, leaving her his fortune, he married her and was then a widower with a family, and about four months later able to contribute to the combination of their fortunes involved here a vacant lot valued at about $2,000 as against her contribution claimed to be worth over a quarter

of a million dollars, fairly shown by the testimony to approximate that amount and to carry with it an annual income of about $15,000.   By this manipulation of titles, the management and usufruct of the property would legally become his while they both lived, and assuming he entertained the not uncommon belief that all men are mortal but himself, he had the further temptation that ultimately all would be absolutely his.   While they both lived she was legally stripped of all beneficial enjoyment of the property. She could neither sell, mortgage, manage, or realize the income from it, except through his generosity or marital obligation to support her.   Neither could she dispose of any of it by will except on the contingency of her surviving him.   What her understanding was is not shown, but no question of a gift is involved. He contributed a consideration, and on the face of the proceeding it purports to be a business transaction.

"Whenever a husband acquires possession of the separate property of his wife, whether with or without her consent, he must be deemed to hold it in trust for her benefit in the absence of any direct evidence that she intended to make a gift of it to him."   13 R. C. L. p. 1387.

See, also, *Stickney* v. *Stickney*, 131 U. S. 227 (9 Sup. Ct. 677) ; *Sykes* v. *City Savings Bank*, 115 Mich. 321 (69 Am. St. Rep. 562).

It stands undisputed that soon after they were married defendant obtained from deceased through the conveyances in issue here complete control of and a paramount beneficial interest in the large estate which she individually owned when they were married, for, so far as shown, a wholly inadequate and insignificant consideration.

The general principle we find decisive of this case is well stated in the leading case of *Boyd* v. *De La Montagnie*, 73 N. Y. 498 (29 Am. Rep. 197), as follows:

"A court of equity will interpose its jurisdiction to set aside instruments between persons occupying relations in which one party may naturally exercise an influence over the conduct of another. A husband occupies such a relation to the wife, and the equitable principles referred to would apply to them in respect to gratuitous transfers by the wife to the husband, however it might be in ordinary business transactions, which the wife may legally engage in. When this relation exists the person obtaining the benefit must show, by the clearest evidence, that the gift was freely and deliberately made. The burden is upon the person taking the gift to show that the transaction was fair and proper (citing cases). Hence, the law, with a wise providence, not only watches over all the transactions of parties in this predicament, but it often interposes to declare transactions void, which, between other persons, would not be held objectionable. It does not so much consider the bearing or hardship of its doctrine, upon particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means, secret and inaccessible, to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties."

As to statutory removal of the wife's common-law disabilities, it is said in *Darlington's Appeal,* 86 Pa. St. 512 (27 Am. Rep. 726) :

"So long as their common-law rights and disabilities were unaffected by statute, there could hardly have been occasion for application of those rules to them; but when statutes secure to married women their property, with right of its enjoyment and disposal, occasions arise when they need and ought to have the full benefit of rules established for the protection of persons, whose relations to others give the latter the power and means of exerting an undue influence over the former. The conveyance of a wife's estate for her husband's use will be held void, unless it affirmatively appears, from the attending circumstances, or otherwise, that it was her voluntary act and not induced by his undue influence."

Language of like general import may be found in a variety of cases from other jurisdictions. The subject is comprehensively discussed with numerous citations in 13 R. C. L. p. 1367, § 411, in part as follows:

"Owing to the near connection between the parties, in many relations, the transaction in itself is considered so suspicious as to cast the burden of proof on the person who seeks to support it, to show that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscientious. So it is recognized that the most dominant influence of all relations is that of husband over wife, and from an early date the courts have jealously scrutinized transactions between them to prevent a wife from being overreached or defrauded by the undue influence or improper conduct of her husband; and in order to sustain a transaction by which the husband secures for his benefit the property of his wife, the law imposes the burden on him to show that the arrangement was fair and conscientious and that no improper use was made of the confidence arising out of the marriage relation."

This court has more than once indorsed that general rule as a principle of equity jurisprudence. In *Pritchard* v. *Hutton*, 187 Mich. 346, it is said:

"This court has frequently said that the relations between parties may be such as to raise a fiduciary relation, and in such a case a presumption of undue influence frequently arises which calls for explanation. Such presumption is one of fact. *In re McMaster's Estate*, 163 Mich. 210; *Conklin* v. *Conklin*, 165 Mich. 571; *In re Hartlerode's Estate*, 183 Mich. 51."

In *Conklin* v. *Conklin*, *supra*, it was said of the defendant who was a relative and the physician of a deceased testatrix:

"The relations of defendant Conklin to testatrix raised a presumption of influence which would call

for explanation on his part.   *In re Bromley's Estate,*
113 Mich. 53; *Cooper* v. *Harlow,* 163 Mich. 210."

Appealing to the equities in behalf of defendant and
"the future of his minor children," it is said in his
counsel's brief:

"What have these plaintiffs done or contributed to-
wards this property?   Nothing.   This property was
acquired by Mrs. Van Hoffman through her first hus-
band.   None of it was obtained by gift or descent
from her blood relations."

Neither was it from his.   His only contribution
beyond theirs of nothing was a vacant lot of compara-
tively small value.   On that proposition the equities,
if any, are not badly out of balance.   With the deeds
involved here canceled, defendant's second matrimonial
venture has proved fairly profitable, and above the
average.   Deceased died without issue.   By our
statute of descent and distribution of estates he gets
half of an approximately $250,000 estate deceased
owned when he married her, and has, so far as the
testimony shows, realized about $75,000 from it while
she lived.

For the foregoing reasons the decree appealed from
should be reversed and a decree entered herein grant-
ing the relief prayed for in plaintiffs' bill, with costs
to them.

SHARPE, C. J., and SNOW and McDONALD, JJ., con-
curred with STEERE, J.

WIEST, J.   I have not reached the conclusion an-
nounced by Mr. Justice STEERE.   Mrs. Kramer was
mentally competent to execute deeds; at least there is
no evidence that she was incompetent.   No undue in-
fluence was shown and no fact disclosed from which
it might, in the remotest degree, be inferred.   If
husband and wife want to place their properties so
they will hold as tenants by the entireties they are at

perfect liberty to do so.    If the wife owns all the property she may, at will, cause it to be held by her and her husband as tenants by the entireties.    Mrs. Kramer lived for six years after the creation of the tenancy, and there is not a word in this record showing that what had been done was not in full accord with her desire.    We may not consider the inequalities of property rights, subjected by the desire of husband and wife to a holding by the entireties, as an equitable ground for setting the same aside.

The decree is affirmed, with costs to defendant.

BIRD, FELLOWS, and CLARK, JJ., concurred with WIEST, J.