## WHITELEY *v.* WHITELEY.

DEEDS—CANCELLATION—GIFT—FRAUD—BURDEN OF PROOF.

Where a son of mature years and business experience obtains from his aged and feeble mother, without consideration, a conveyance of valuable property, which a few weeks before she had devised by a will unsatisfactory to the son, and which, as she had occasionally expressed herself, she had intended to retain control of until her death, and it appears, on a bill to set aside the deed, that she was given no opportunity, before executing the conveyance, to consult with any one except the donee and his immediate family, the burden of showing the good faith of the transaction is upon the donee; especially if the grantor, upon being informed, subsequently, that such a conveyance was of record, repudiated the grant, and claimed that it was represented to her that the paper signed was simply a modification of her will.

Appeal from Ingham; Person, J. Submitted February 9, 1899. Decided April 18, 1899.

Bill by Elizabeth Whiteley, revived in the names of James Whiteley, executor, and others, devisees of deceased,

against Elizabeth Whiteley and Nellie M. Whiteley, to set aside a deed. From a decree for complainants, defendants appeal. Affirmed.

*Smith & Hood,* for complainants.

*M. V. & R. A. Montgomery* ( *Charles F. Hammond,* of counsel), for defendants.

LONG, J. This bill was filed to set aside a deed made by Elizabeth Whiteley, deceased. The court below entered a decree setting the deed aside. Defendants appeal.

The facts are set out in the opinion filed by the court below. We have read the record with care, and are satisfied that the circuit court was not in error in entering the decree in accordance with the prayer of the bill, and therefore adopt as our own the opinion of that court, as follows:

"This suit was commenced by Elizabeth Whiteley, the mother of John Whiteley and James Whiteley, against Elizabeth, the widow of John, and Nellie, his only child and heir at law. Its object is the cancellation of a certain deed made by the mother to John in his lifetime. The mother herself has died since the bill was filed, and the case stands revived, with her executor and devisees as present complainants. The old lady was owner of a farm in the country and certain real estate in the city. She also had a small amount of personal property. The country and city properties about equaled each other in value. John and James were both of mature years, and were her only children. Her home was, and for a long time had been, with James, but she was in the habit of paying John occasional visits. It cannot be said, from the evidence, that she had, up to the time of the occurrence out of which this suit has grown, more affection for the one son than for the other. John was a man of quite large wealth, and James, I think, was in comfortable financial circumstances. In the early fall of the year 1890, the old lady met with a severe accident, shortly after which she executed a will. By the terms of this will the farm was to go to James, and the city and personal property to John, the latter to pay the former $1,500 in money to equalize the distribution. It is true that the propriety of

drawing the will was suggested to her by James, but it is not shown that he in any way suggested or helped to determine the provisions it should contain. On the whole, these seem to have been strictly in accordance with a purpose the mother had long held, and sometimes expressed to her friends, of retaining all the property under her own control so long as she might live, and then dividing it equally between the two sons.

"John soon heard of this will, and, being unable, as it seems, to discover what it contained, became strongly possessed with the idea that he had been unfairly dealt with in the disposition of the property. In consequence of this, he deliberately set about to secure from his mother such a conveyance in his own behalf as should be satisfactory to himself. With this object in view, his first care was to have the mother brought, from the house where she lived with James, to his own house, where no relative except members of his own immediate family should be near her. What took place when this had been accomplished we do not know, for both the mother and John were dead when the testimony was taken; but presently, and within a few weeks after making the will, she was induced in some way to sign the deed in question. Whatever the representations made to her were, it is clear that the deed was obtained without consultation on her part with other relatives, or even with a disinterested friend. No outsider listened to a word of the negotiations, and the notary, called in by John, was the only person present when the instrument was executed.  *   *   *  If there was any consideration for the deed so made, which I doubt, it was so disproportionate to the value of the property described that the transaction, at the best, was no more than a gift. This deed was at once recorded by John, but no further information as to its existence was given to any of the old lady's friends. She went on controlling the property, calling it her own, and paying taxes on it, as though no conveyance had been made. This state of affairs continued nearly two years, until the record of the transfer was discovered in the register's office by one of James' sons. When the old lady was informed that such a deed from her appeared to be in existence, she at once repudiated the transaction, denounced John's conduct, declared that she never intentionally or knowingly executed such an instrument, and filed this bill asking that it be set aside and canceled. She did acknowledge, however, signing some

paper while at John's, but said that she supposed it to be
but a modification of the will already mentioned, so that
John might have the city property, at her death, without
paying to James the $1,500 as contemplated by its original
terms.

"Whatever the truth in this matter, I cannot believe
that John reflected or stopped to consider that he might
be perpetrating a' fraud upon his mother. He was ab-
sorbed with the desire to so secure to himself what he
believed to be his rights that neither the influence of
James nor his mother's ultimate wishes could take them
from him. But if he did obtain the deed, either through
actual deceit or by misapprehension on the mother's part,
it was a fraud in fact, however little he may have thought
of it in that light. While the transfer was of the nature
of an ademption of an intended devise, it yet was a pres-
ent absolute conveyance in fee, which at once stripped the
mother forever of all further control of the property,
whatever might be her necessities. If the mother did not
desire or propose this, it was a great wrong done her, and
a wrong to James, whose intended share would have to
bear all the burden of the mother's future expenses.

"In trying to determine what really took place, we at
once find ourselves absolutely in the dark as to all of the
immediate facts of the transaction. We know nothing
positively about what took place between John and his
mother from the time she was brought into his family
down to the execution of the deed. Both are dead, and
we have the sworn story of neither. All that part of the
affair—the vital part—is blank. In some instances the
relation of parties is such, as where an attorney receives a
gift from a client, or a guardian from a ward, and even
when the obligation is one of mere *quasi* trust, that the
law itself takes notice of the inequality in their situations,
and demands of the donee of a gift affirmative proof of the
fairness and good faith of the transaction. That rule does
not, ordinarily, apply to parent and child, simply as such;
but, when the circumstances are unusual and suspicious, it
may apply. I think it should be applied in this case. Here
the son—a man of mature years and business experience—
deliberately planned to obtain valuable property from his
very old and feeble mother. As a part of that plan, and
for that purpose alone, he has her brought into, and re-
tains her in, the privacy of his own home, away from all
other relatives. He instructs the conveyancer, whom she

does not see alone for a moment, and a present convey-
ance in fee is obtained of valuable property without giving
the aged grantor opportunity to consult any adviser or
friend. It is hardly necessary to project and carry out
such a scheme as this to obtain a free and voluntary gift;
and such deed is found to be, not only antagonistic to the
general purpose which she is supposed to have always en-
tertained, and which she had recently reiterated by her
will, viz., to retain the property to herself so long as she
might live, but not in accordance with what would natu-
rally be expected from her feelings towards her other son.
These circumstances, as I am firmly convinced, call em-
phatically, as a matter of public policy, upon those claim-
ing under the deed, for clear and satisfactory proof that
the old lady both intended the conveyance and fully
understood its purport and effect. 'A gift, though un-
tainted by fraud, will always be set aside if it does not
conform to the intention of the donor, or if executed under
a total misapprehension as to its effect. In the case of a
deed of gift, the question is not, Did the donor execute the
deed voluntarily? but, Was it with full knowledge of the
nature, effect, and consequences which the law gives it?
To be upheld, it must be the pure, voluntary, and well-
understood act of the donor's mind. The court will not
recognize any deed of gift when it appears that there was
any defect in the understanding of the nature of the gift on
the part of the donor. If the deed is but tainted with the
want of complete understanding of its nature by its author,
the court must treat it as invalid, and consider that the
property did not pass.' Thornt. Gifts, § 450. And it has
also been said: ' If a doubt exists as to whether the donor
knew all of the provisions of the deed, it is void.' *Id.* §
448, note 2.

" With the burden of proof, as a matter of public policy,
thrown on those claiming under the deed, we yet have
only the testimony of the conveyancer as tending to show
knowledge and intent on the part of the old lady; and
while his good faith in the affair is undoubted, and while
full credit is given to his statements, they do not, and, in
the nature of things, cannot, go far enough to establish
that freedom of action by the old lady, and comprehension
of consequences, necessary to sustain the transaction. He
saw her but a few moments, and then in the presence of
the grantee and his family. His explanation of the char-
acter of the paper must have been understood by her, if

she actually understood at all, in the light of what had been said before by John; and of the talk between her and John we know nothing. Neither the conveyancer himself, as he admits, nor the court, can feel sure that this brief explanation, gone over but once, was comprehended by the deaf and feeble old lady in any substantial sense at all. To sustain this gift, under the circumstances, a knowledge of the material facts which led up to the execution of the deed is of more importance than a knowledge of what took place just at the time of the execution.

"A decree must be entered in accordance with the prayer of the bill."

The decree of the court below must be affirmed, with costs.

GRANT, C. J., HOOKER and MOORE, JJ., concurred. MONTGOMERY, J., did not sit.