PRITCHARD *v.* HUTTON.

1. DEEDS—CANCELLATION OF INSTRUMENTS—HUSBAND AND WIFE—UNDUE INFLUENCE—PRESUMPTIONS—FRAUD.

Where complainant, the daughter of decedent, filed a bill for the cancellation of certain deeds executed by decedent to defendant, his second wife, alleging undue influence and fraud, and the evidence showed an estrangement between the father and daughter and a bitter feeling existing between the parties because of decedent's marriage to defendant, the mere fact that decedent so disposed of his

property as to do an apparant injustice to complainant would not raise a presumption of undue influence or fraud, or nullify the transaction.

2. SAME—HUSBAND AND WIFE—UNDUE INFLUENCE.

Evidence of undue influence, and that decedent was subject to the dominating influence of defendant, his wife, examined, and *held*, not to support the allegations of the bill: undue influence cannot be predicated upon mere opportunity for its exercise.

3. SAME—HUSBAND AND WIFE—FIDUCIARY RELATION—PRESUMPTIONS.

The mere fact that decedent made provision for defendant, his wife, by deed, did not create a fiduciary relation between them, raising a presumption of undue influence or fraud.

4. SAME—FIDUCIARY RELATION—QUESTION OF FACT.

Even where the relations of the parties are such as to create a fiduciary relation, the question of undue influence is one of fact.

5. SAME—INSANITY—CAPACITY.

It is not necessary, to defeat a deed or contract, that positive idiocy or insanity of the grantor be shown; it is sufficient to show that there is such a marked mental deficiency to justify the conclusion that there has been no such meeting of minds as is necessary to create a valid deed or contract.

6. SAME—HUSBAND AND WIFE—FRAUD.

Any undue advantage gained by the use of the marital relation is a legal fraud, and in the case of a conveyance by a husband feeble and weak of mind to his wife, the courts will scan the transaction very closely to discover the animus with which the conveyance was brought about.

7. SAME—EVIDENCE—UNDUE INFLUENCE—HUSBAND AND WIFE— PARENT AND CHILD.

Where, by the overwhelming weight of the evidence it appears that the grantor was in the exercise of his own independent will and judgment, and that his mind dominated and controlled the transaction, the court will not set aside the deed, although the effect was to bestow his property upon his wife to the exclusion of his child and other relatives.

8. SAME—HUSBAND AND WIFE—FRAUD.

It is not unlawful for a wife to use her wifely influence for

her own benefit or that of others, unless she acts fraudulently.

9. SAME—UNDUE INFLUENCE—PRESUMPTIONS.
   The failure of a testator to give his property to near relatives, with whom he was not on good terms, raises no presumption of undue influence on the part of the wife, to whom the property was deeded.

Appeal from Wayne; Hally, J. Submitted April 7, 1915. (Docket No. 8.) Decided July 23, 1915.

Bill by Annie Pritchard against Elizabeth Hutton and William Henry Hutton for the cancellation of certain deeds and for other equitable relief. From a decree for defendants, complainant appeals. Affirmed.

*Lucking, Helfman, Lucking & Hanlon,* for complainant.

*Washington I. Robinson* and *James H. Pound,* for defendant Elizabeth Hutton.

STONE, J. The bill of complaint in this cause was filed by the complainant, who is a daughter, and claims to be the only child, of William Hutton, deceased, to set aside various deeds executed by the deceased directly to the defendant Elizabeth Hutton, his second wife, to impress with a trust other realty received by her from third persons in exchange for realty deeded to them by the deceased, and to secure complainant her share of her father's personal property.

The previous family history bearing upon the case is well stated in the opinion of the learned trial judge, who heard the case in the court below, and the same is here quoted:

"William Hutton, whose property is the subject of this litigation, was in the '70's engaged in the business of boiler making in the city of Detroit. At the age of 53 he retired from business, being at that time possessed of considerable real estate in the city of Detroit. He was a married man, had a wife and one

or more children; whether one or more it is not neces-
sary in this case to decide. In 1894 his wife died. He
remained a widower until August 3, 1901. He resided
on Congress street when the principal incidents related
in the testimony in this case transpired. His next-
door neighbors were a Mr. and Mrs. Bennett, both con-
siderably younger than William Hutton. Some time
in the year 1900 gossip in the neighborhood connected
the names of Mr. Hutton and Mrs. Bennett in such a
way that the daughter of Mr. Hutton, complainant in
this case, saw fit to speak to her about the improper
conduct of Mrs. Bennett with her father. Mr. Bennett
was in like manner spoken to concerning the conduct
of his wife, and something of a neighborhood furor
grew out of the situation. Bennett died December 11,
1900. Complaint was made against the husband of
complainant for slander, and in the police court the
husband justified the accusations he had made by the
recital of a transaction that he had seen between Mrs.
Bennett and Mr. Hutton on Webb avenue, in the city
of Detroit. The case in the police court was tried
before a jury, and the jury found him guilty. He ap-
pealed to the recorder's court, and, pending the trial
on the appeal, Mrs. Bennett married William Hutton;
the marriage taking place August 3, 1901. This union
resulted in almost a total severance of relations be-
tween William Hutton and his child or children.

"Previous to this time he had given his grandchildren
some property and had also given his daughter some
property. The gifts to these might be stated as fol-
lows: To his granddaughter, Ida, property worth ap-
proximately $14,000; to his grandson, William Sands,
property valued at about $5,000; to his daughter, the
complainant, property valued at about $5,000. The
two grandchildren above mentioned were children of
the complainant by her first husband. She has three
children by her second husband. None of the children
or the daughter during the 12 years of married life
of William Hutton with the defendant visited with or
held anything more than passing comment with him.
On November 19, 1903, he transferred a portion of his
property, and with his wife paid the difference in cash,
acquiring a piece of property which he put in her name.
Mr. Hart, who was the other party to the transfer,
said that it was Mr. Hutton himself personally who

directed that the new deed should run to Mrs. Hutton. On March 31, 1904, he signed another instrument, which during the course of the taking of testimony was referred to as the marriage settlement. By this four or five pieces of property were deeded to Mrs. Hutton. On September 12, 1907, he made a deed to Allen for the purpose of creating the estate by the entirety respecting other property. On June 2, 1909, he made a transfer with Philo Hall and his wife of certain property, taking other holdings in its place, and having the deed to this new holding run to Mrs. Hutton. Subsequent to this he sold some property to Silas Hall. He died April, 1912. Immediately upon his death this bill was filed by the complainant, asking the court to set aside these transfers.

"During the course of the taking of the testimony and on the argument it was substantially admitted that William Hutton was not of unsound mind. Complainant and her husband would not deny his sanity. The attorney representing them described his condition as 'one of failing health and weakening mentality, so that his mind was in a condition making it easily susceptible to the undue influence which was exercised upon him by his new wife,' and insists that the situation is such that the burden of proof rests not upon the complainant to show the situation, but that that burden is shifted and falls upon the defendant. I know of no presumption of law which would shift this burden from the shoulders of the daughter to the shoulders of the wife. I do not think the conclusion is justified that the law of Michigan shifts a burden in a case of this kind, under the circumstances that are here developed. William Hutton was undoubtedly capable of transacting business almost to the last moment of his life; and, if there is any sacredness to the personal right of property, his disposition during his lifetime and at various stages during his lifetime should not be disturbed by a court, unless there is an unmistakable showing of that undue influence which would justify such an action. In this respect the testimony of Mr. Johnston is relied upon. In passing it might be stated that Mr. Johnston is the only one of the old friends, sometimes called cronies, of the deceased, who took the stand in complainant's favor. His testimony goes to the extent that Mr. Hutton had in his lifetime told

him that he was induced by one Flouddy to go to the office of Mr. Chamberlain and sign some papers, the import of which he did not understand. If Mr. Hutton said this, he said it in a moment of pique. He was more than once at the office of Mr. Chamberlain and Mr. Chamberlain testified that Mr. Hutton understood what he was doing, and that it was explained to him. Besides this, several witnesses, who were present at some one of the meetings at Chamberlain's office, and in this they are substantiated by Mr. Chamberlain, tell of the remarkable recitation by William Hutton of an exact description from memory of all of the property which he desired transferred. If he did not know what he was doing, or if he was being forced by some dominating influence to make this deed of this property, that dominating influence must have gone so far that it not only controlled his will but it also controlled his memory. There are no circumstances in sufficient quantity given in this case which would justify the conclusion that it was possible for any other mortal to so dominate both the will and the memory of the deceased. Some of the minor circumstances developed concerning his married life indicate quite clearly that he had a will of his own, and that his memory was exercised acutely or otherwise dependent entirely upon what he wished in that respect.

"Whatever may be the individual notion of the just manner in which an ancestor should dispose of his property, every competent person has a right to dispose of it as he wishes. There is a sort of moral notion that a father must dispose of his property in equal shares to all of his children, and that, if he does not do so, those who get less than an equal share are deprived of some of their rights. It is probable that the more or less universal disposition along this line justifies some such notion, but it does not exist in either morals or law. William Hutton was competent to dispose of his property and dispose of it as he wished it disposed of himself. It would not be proper for a court to set its judgment in opposition to his."

We have carefully read and considered the entire testimony in this large record, consisting of upwards of 500 pages. Many witnesses were examined. We cannot be expected to quote their testimony.

For the reasons stated in the foregoing opinion, the relations existing between the deceased and the complainant, her husband and family, as well as the relations between the defendant (the second wife) and the complainant and her family, may be said to have been strained, and the feelings those of bitterness, during much of the period from the death of Mr. Hutton's first wife, in March, 1894, down to the death of Mr. Hutton, which occurred on the 14th day of April, 1912. The testimony of the parties and other relatives upon both sides shows a great deal of bitterness, and we discover more or less exaggeration. No species of testimony is more easily fabricated than that of admissions or declarations of a deceased person. We have endeavored to give due weight to the testimony, however, taking into consideration the interest of the parties testifying. Outside the testimony of the parties and their immediate relatives, and considering the testimony of disinterested witnesses, we are strongly impressed with the fact that the bill of complaint has not been supported by the weight of the evidence in the case. The charge is made in the bill of complaint that all of the numerous transfers made, and deeds executed by the said William Hutton to the defendant, his second wife, were made without any intelligent appreciation, understanding, or realization of the effect thereof by the said William Hutton; that said deeds so executed by said William Hutton were not executed by him voluntarily, or of his own free will, but that the will resulting in the execution of said deeds was the will of the said defendant Elizabeth Hutton, and her dominating influence was solely responsible therefor; that the said defendant Elizabeth Hutton fraudulently and unlawfully took advantage of the age, feebleness, and lack of will and intelligent understanding of said William Hutton, and fraudulently and unlawfully induced him to make the transfers and to execute the

deeds aforesaid, and that the execution of all of said deeds by said William Hutton was due solely to the undue influence of said defendant Elizabeth Hutton and to the fact that she dominated, intimidated, and coerced him into signing said deeds and transfers, so that she might obtain all of the estate and property of William Hutton for herself, and might fraudulently deprive complainant of any share or right therein. And it is further charged that if the said William Hutton had not been so coerced, intimidated, and unduly influenced, and had understood what he was doing, he would have made suitable provision for complainant and her children out of said property and estate. We refer to these allegations to indicate the measure and character of the evidence necessary to support the bill.

The evidence shows that William Hutton died at the advanced age of 88 years. The evidence of more than a score of disinterested witnesses from all the walks of life, who were his neighbors and acquaintances, and who had known most of his business transactions, shows that he was a man, although with some physical infirmities, yet of strong characteristics, possessed of more than ordinary intelligence and of an unusually strong mind, with a dominating will, and was a man not easily influenced. The uncontradicted evidence shows that he was a man who took an interest in current events down to the time of his death; that he was in the habit of reading the daily newspapers and discussing public questions with intelligence and interest. As a member of a fraternal organization he had been the treasurer of his lodge, had not only kept its accounts but at its meetings had engaged in its deliberations and discussions, and was a man able and capable of taking care of himself under all circumstances. The history of the case shows the occasion for his bitter feeling toward complainant and her husband. They had circulated slanderous and, as it is claimed, false

187 Mich.—23.

charges against him and the woman who became his second wife, charging them with illicit and improper relations, even before the death of his first wife, until the matter finally culminated in the prosecution of complainant and her husband for slander of the defendant before his marriage to her; that, upon the trial of the case against the husband of complainant before the police court, Mr. Hutton had testified as a witness against him, which prosecution had resulted in his conviction. Numerous disinterested witnesses testified to statements made by the deceased that he had given complainant and her children all the property which he would ever give them; that they had attempted to blacken his reputation and that of his second wife, the defendant Elizabeth Hutton. After the death of his first wife he lived for a time in complainant's family. Matters became, as he stated, so unpleasant that he finally left and went and lived with a sister for a time, immediately before his marriage to defendant.

It is not the claim of complainant or her husband that these charges were not made by them against deceased and the defendant while she bore the name of Mrs. Bennett, and there is no claim that these charges against them were not real, but were delusions upon his part, for complainant and her husband both gave testimony upon the hearing in this case to justify their charges, and reiterated the truthfulness of the so-called slanderous language. The motives in part for the conduct of Mr. Hutton in deeding his property to his second wife are to be found in the relation which existed between him and complainant and her family. The question here is, not whether his motives were such as to be approved in all respects, but whether his conduct in disposing of his property were his voluntary and freewill acts, and the acts of a sane man possessing a disposing mind. We are strongly impressed with

the testimony in the case that he was a man possessing a strong will, and that the acts of disposing of his property by deeding it to his second wife (with whom he lived nearly eleven years) were his own intelligent acts, long contemplated, and not the acts of a weakling, or of a person controlled by another. This property was disposed of by him to his second wife at different times; the last transaction occurring nearly three years before his death. During all of the period of his married life with defendant he continued to look after the property, collect the rents, and make repairs thereon, always saying that he intended it to be that of the defendant, and often reiterating that he knew what he had done. During all of his married life with the defendant the complainant and her family never visited him. The bitterness continued to the day of his death, and none of them attended his funeral, although they lived in the immediate vicinity and saw the crape upon his door. What he did was what might have been naturally expected.

This court has often said that the mere fact that a decedent so disposed of his property as to do an apparent injustice to one or more of his relatives would not nullify the transaction. Courts are not permitted to make equitable distribution of estates, but are concerned only in giving effect to the legal acts of decedents. A careful study of the record in this case discloses the reasons why Mr. Hutton made the disposition which he did of his property to be because of the bitterness which existed, for the reasons stated, between himself and complainant and her family, and further that his second wife, who lived with him and cared for him during nearly 11 years, had, in his judgment, so conducted herself by her wifely attention to his comfort as to be worthy of receiving all the property which he bestowed upon her. In the able brief of complainant's counsel they base their argument upon the following proposition and authorities:

"Where a woman of 44 married a man of 76, who had acquired all his property prior to said marriage, and with whom, while her first husband was living, she had kept up a questionable intimacy for some years despite vigorous protest of the daughter and only heir at law of the aged man, and within a few years after said marriage to him obtained all his realty by successive deeds in his seventy-eighth, seventy-ninth, eighty-second, eighty-third, and eighty-fourth years and also all of his personalty, while he was surrounded by and subject to her dominating influence and separated from his daughter and grandchildren, and also deaf and in poor health, and where it is shown that she hated the daughter and son-in-law, both of whom she had caused to be arrested for slander prior to said marriage, equity will raise, under such circumstances, a presumption of fraud and undue influence, and will cast upon the wife the burden of proving that the deeds and gifts were made without undue influence or fraud"—citing *Witbeck* v. *Witbeck*, 25 Mich. 439; *Noban* v. *Shoup*, 171 Mich. 191 (137 N. W. 75); *Whiteley* v. *Whiteley*, 120 Mich. 30 (78 N. W. 1009); *Smith* v. *Cuddy*, 96 Mich. 562 (56 N. W. 89); *Tyner* v. *Varien*, 97 Minn. 181 (106 N. W. 898); *Disch* v. *Timm*, 101 Wis. 179 (77 N. W. 196); *Haydock* v. *Haydock*, 34 N. J. Eq. 570 (38 Am. Rep. 385); *Lins* v. *Lenhardt*, 127 Mo. 271 (29 S. W. 1025); *Haggard* v. *Mason*, 153 Ky. 113 (154 S. W. 907); *Paschall* v. *Hall*, 58 N. C. 108; *Paulus* v. *Reed*, 121 Iowa, 224 (96 N. W. 757); 1 Devlin on Deeds, p. 135, and cases cited—to which may be added as later cited: 20 Cyc. p. 1219; 6 Ency. of Evidence, pp. 10, 11, 12, 219, 221; Smith on Fraud, § 115; 2 Pomeroy's Equity Jurisprudence, §§ 951, 955, 956, 963.

The applicability of the above-cited authorities to the case made by this record may well be questioned. The case is largely one of fact.

The foregoing statement of the case is hardly justified by the overwhelming weight of the evidence in the case, to wit, that there was a questionable intimacy between the defendant and the deceased while her first husband was living. This is not only denied, but, in the light of all of the evidence, is highly improbable.

The statement begs the entire question that deceased was subject to the dominating influence of the defendant. The facts in the case do not, in our judgment, warrant any such conclusion. At most it may be said that the wife had the opportunity to exercise undue influence; but it has been often said by this court that:

"Undue influence cannot be predicated upon mere opportunity for its exercise." *Blackman* v. *Andrews,* 150 Mich. 322 (114 N. W. 218).

That Mr. Hutton was separated from his daughter and grandchildren during the entire period of his married life with the defendant is true, but that he or the defendant was the cause of such separation is not shown by the testimony in the case. The testimony rather indicates that the complainant and her family kept aloof from the deceased because of their bitterness toward the defendant. There is no indication in the evidence that the complainant or her husband ever retracted any of their charges against the deceased or the defendant, but persisted in making their charges against them upon the hearing of this case. That defendant did cause the arrest of complainant and her husband for slander prior to said marriage is true; and it is true that the husband was convicted of the charge in the police court. Subsequently the case was appealed to the recorder's court, but the marriage having taken place in the meantime, was nolprossed.

We have read with much interest the authorities cited by complainant's counsel. Many of them deal with trust relations. We do not understand it to be the law in this State that, because a husband makes provision for his wife by deed or otherwise, thereby a fiduciary relation is raised or exists between them. It is true, as stated in Pomeroy (2 Pomeroy's Equity Jurisprudence, § 963), after speaking of the equitable doctrine applying with strictness to executors, administrators, and trustees:

"The same general principle extends, with more or less force, to dealings between a physician and patient, a spiritual adviser and penitent, vendor and vendee of land, husbands and wives, and persons occupying their position, partners, and indeed all persons who occupy a position of trust and confidence of influence and dependence, in fact, although not perhaps in law."

This court has frequently said that the relations between parties may be such as to raise a fiduciary relation, and in such a case a presumption of undue influence frequently arises which calls for explanation. Such presumption is one of fact. *In re McMaster's Estate*, 163 Mich. 210 (128 N. W. 259); *Conklin* v. *Conklin*, 165 Mich. 571 (131 N. W. 154); *In re Hartlerode's Estate*, 183 Mich. 51 (148 N. W. 774).

That the deceased was deaf and had been afflicted with catarrh for a number of years is undisputed; but that by those afflictions his strength of body or mind had become so impaired as to be the easy victim of fraud or undue influence is not warranted by this record. In fact, the contrary appears. We recognize the rule to be as follows: It is not necessary, to defeat a contract or deed, that weakness of mind amounting to positive idiocy or insanity be shown. If it appears that there is a mental deficiency so marked as that the conclusion is justified that the party appeared as not exercising deliberate judgment concerning the transaction in question, but, on the contrary, has been simply as putty in the hands of the stronger will, then it cannot be said that a valid contract or deed has been executed. A vital element is lacking in that there cannot then be said to have been any meeting of minds. Out of such a transaction there is presented the product of but one mind. In the case of the conveyance by a husband to his wife, or by the wife to the husband, the grantor being feeble and weak of mind, and a controversy thereafter arising between them, or those representing them, the courts will scan the transaction very

closely to discover the animus with which the contract or deed was brought about. Without question, any undue advantage gained by the use of the marital relation is a legal fraud, as in the *Witbeck Case,* the *Whiteley Case,* in *Noban* v. *Shoup,* and *Smith* v. *Cuddy, supra.*

The vital question in this case is whether or not there has been shown sufficient fraud or undue influence on the part of the defendant to invalidate these conveyances. Even if the rule were in all respects as contended for by complainant's counsel, we are satisfied that, by the overwhelming weight of the evidence, it appears that the transactions, to set aside which this bill was filed, were brought about and conducted by the deceased in the exercise of his own independent will and judgment; that his mind dominated and controlled the transactions; and that the same were executed deliberately and purposely, intending thereby to bestow his property upon his wife, to the exclusion of his child and other relatives. Whether this was wise or unwise is not a question before us.

As was said by this court in *Latham* v. *Udell,* 38 Mich. 238, 241:

"We do not know of any rule of law or morals which makes it unlawful or improper for a wife to use her wifely influence for her own benefit or for that of others, unless she acts fraudulently, or extorts benefits from her husband when he is not in a condition to exercise his faculties as a free agent. A faithful wife ought to have very great influence over her husband, and it is one of the necessary results of proper marriage relations. * *. * There is no legal presumption against the validity of any provision which a husband may make in his wife's favor. * * * There can be no fatally undue influence without a person incapable of protecting himself, as well as a wrongdoer to be resisted."

· We are satisfied from the entire record that Mr. Hutton was entirely able to and did control his own

actions, and was not weak enough to be a mere instrument in any one's hands. It is not strange or unnatural that he should have taken offense and become embittered toward complainant and her family, and that he should remember the wife, who was kind and thoughtful of his interest and happiness.

The failure of a testator to give his property to near relatives, with whom he was not on good terms, raises no presumption of undue influence. *In re Merriman's Appeal,* 108 Mich. 454 (66 N. W. 372).

"Courts are not permitted to make equitable disposition of estates, but are concerned only in giving effect to the legal acts of testators." *Price* v. *Hagle,* 171 Mich. 455 (137 N. W. 253).

See, also, *Reichert* v. *Reichert,* 144 Mich. 295 (107 N. W. 1057) ; *Terry* v. *Terry,* 170 Mich. 330 (136 N. W. 448) ; *Keller* v. *McConville,* 175 Mich. 479 (141 N. W. 652).

In our opinion the learned trial court reached the correct conclusion in the case, and the decree of the circuit court is affirmed, with costs to the defendant Elizabeth Hutton.

BROOKE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.