## ABRAHAM v. DOSTER.

1. EVIDENCE—ADMISSIONS AGAINST INTEREST.
    Admissions of a party against his interest are admissible against him as primary evidence.

    Per STARR, C. J., NORTH, BUSHNELL, BOYLES, and REID, JJ.

2. DEEDS—EQUITY—COURTS.
    The Supreme Court, in determining the validity of transfers of both real and personal property which had been made by decedent to defendant, his practical nurse, is not permitted to make what it thinks is an equitable distribution of property, the primary concern being the giving of effect to the legal acts of deceased.

3. SAME—MENTAL COMPETENCY—FRAUD—UNDUE INFLUENCE.
    Despite old age, mental deterioration and physical infirmities, one who is mentally competent as a matter of law, in the absence of fraud or undue influence, has the legal right to control the disposition of his property.

4. SAME—MENTAL COMPETENCY—FRAUD—UNDUE INFLUENCE—EVI-
DENCE.

In suit to set aside transfers of both real and personal property
which aged decedent had made to defendant, a practical nurse
who had attended both decedent and his late wife for over
eight years preceding his death, plaintiff failed to prove that
decedent was mentally incompetent or that defendant had ob-
tained the property by fraud or undue influence.

Per STARR, C. J., and NORTH, BUSHNELL, SHARPE, and BOYLES, JJ.

Appeal from Allegan; Miles (Fred T.), J. Sub-
mitted October 5, 1944. (Docket No. 60, Calendar
No. 42,831.) Decided January 2, 1945. Rehearing
denied February 20, 1945.

Bill by Ola Abraham against Mary Doster for an
accounting and to set aside conveyances. Chester A.
Ray, special administrator of the estate of Chaun-
cey F. Abraham, deceased, intervened as party
plaintiff. Decree for plaintiffs. Defendant appeals.
Reversed.

*Harry Pell,* for plaintiffs.

*Leo W. Hoffman* and *Alexander, McCaslin & Cho-
lette,* for defendant.

SHARPE, J. (*concurring*). This is a suit for an ac-
counting and to set aside certain conveyances made
by Chauncey F. Abraham to Mary Doster.

Prior to June 5, 1934, Chauncey F. Abraham and
wife resided on a farm in Allegan county, Michigan.
On that date defendant returned to Plainwell, in said
county, to stay with and take care of Mr. and Mrs.
Abraham. At that time Mr. Abraham was 82 years
of age and his wife 76. Mrs. Abraham was in poor
health and somewhat affected mentally, while Mr.
Abraham was partially bedridden. It was agreed

that defendant was to work mornings for $4 per week and $10 per week when she was employed full time in the service of the Abrahams. Defendant received $4 per week for a short time, when Mrs. Abraham became ill and needed more attention, after which time defendant received $10 per week until Mrs. Abraham's death, in February, 1936. After Mrs. Abraham's death defendant continued to keep house for Mr. Abraham until his death, September 30, 1942, at which time Mr. Abraham was 90 years of age.

Shortly after Mrs. Abraham's death Mr. Abraham and defendant made an automobile trip "up north", and while on this trip Mr. Abraham became seriously ill. He was taken home and defendant cared for him during his illness. On July 24, 1936, Chauncey F. Abraham made a will, in which he willed to defendant the use and possession of his farm for a period of one year immediately following his death. On July 25, 1936, he executed a deed by which he transferred a house and lot in Plainwell to defendant. This deed was recorded August 11, 1936.

Prior to the time defendant went to the home of Chauncey F. Abraham his business affairs had been taken care of by a neighbor, Elmer Chamberlain, but after defendant went to the home of deceased she handled all of his business transactions in connection with the management of the farm and home.

In 1936, after deceased made his will and executed the deed, defendant obtained a safety deposit box in the Plainwell bank. She closed out deceased's checking account and thereafter deposited deceased's money in a savings account. She was given a power of attorney by deceased to sign checks and other papers. She had her mother come to live with her for a period of about two years. She also took

in boarders for a short time. She raised chickens and rented out the farm.

When defendant came to live at the home of deceased he was the owner of stock in the Standard Savings & Loan of the value of $3,000 and 70 shares of preferred stock of Consumers Power Company, in addition to his farm and house and lot in Plainwell.

Between December 9, 1938, and June 3, 1939, defendant withdrew from the Standard Savings & Loan $2,450. On June 10, 1940, she transferred five shares of Consumers Power Company stock to Roland Remington, and eight shares to her mother. Deceased verified and consented to these transfers. Of the Consumers Power Company stock transferred to defendant, 52 shares were subsequently transferred to Dr. Willard R. Vaughn. Defendant spent about $1,400 repairing her home in Plainwell. She purchased another house in Plainwell for $2,200, and resold the same on land contract for $2,300. She also purchased farm machinery for some of her relatives, and spent some money in equipping the farm.

The trial court filed an opinion in which it was found that deceased, during the last four or five years of his life, was not mentally competent to look after his own interests, and entered a decree requiring defendant to account for the 31-acre farm, of the value of $3,500; the house and lot in the village of Plainwell, sold on land contract by defendant for $2,300; 15 shares of stock of Consumers Power Company; and an automobile which was in the name of defendant.

Defendant appeals and urges that deceased was competent to make transfers of property in the nature of gifts; that there was no undue influence or

fraud; that the deed to the Plainwell house was not intended as full payment for all future services; and that the deed to the farm and other personal property were intended as outright gifts.

In considering these questions we have in mind that when defendant went to the home of deceased she was 45 years of age, had practical nursing experience, and from the time she arrived until the death of Chauncey Abraham, on September 30, 1942, a period of eight years and four months, she took complete care of these aged people, caring for both until Mrs. Abraham died, and continuing to care for Mr. Abraham until he died. Mr. Abraham was bedridden for the last three and one-half years of his life. Mrs. Abraham was unable to go to the toilet, or comb her hair. Defendant kept house, prepared the meals, fed Mrs. Abraham, and attended to her personal needs. She also took care of the chickens and worked in the garden, carrying fuel and water to the house, and doing the washing. After the first couple of years it was necessary to give similar care to Mr. Abraham. Defendant had to shave him; cut his hair; bathe him; give him a daily alcohol rub; read to him; sing to him; and give him the necessary care when he was bedridden.

We also have in mind that the trial court did not set aside the conveyance of the Plainwell property which was effected by a deed dated July 25, 1936. Plaintiffs not having filed a cross-appeal, no issue is raised as to the ownership of this property.

The paramount issue involved in this case relates to the mental capacity of deceased during the last four or five years of his life. It is urged by plaintiffs that defendant obtained the property by the use of undue influence and fraud practiced upon deceased.

On the question of mental competence of deceased the trial court found as follows:

"Considering the age of Mr. Abraham; the fact that he was confined to his bed most of the time during the last four years of his life; that he was in great pain during most of that time and used a habit-forming drug sedative, during which period about $14,000 worth of property was transferred to defendant; that he was a man of frugal habits; seemed to have a phobia in relation to signing his name or doing any business whatever, resulting in the giving to defendant of the powers of attorney and permitting her to handle all of his business. These things tend strongly to indicate that Mr. Abraham, during the last four or five years of his life, was not mentally competent to look after his own interests."

The only medical testimony offered was that of Dr. Vaughn, who testified:

"*A.* He was physically incapacitated during most of that period (from 1934 until about the time of his death), I would say for the last three years he was bedridden; during the entire period he was mentally alert.

"*Q.* What do you mean by mentally alert, doctor?

"*A.* Well, I would describe it as a person who had all the faculties of mind.

"*Q.* Would you say he was mentally competent during the entire period you treated him from 1934 to 1942?

"*A.* I would.

"*Q.* Now was there any time during the period from 1934 to 1942 when you saw him or observed him, when you would consider him mentally incompetent?

"*A.* It would be when he was under the influence of any drug.

"*Q.* There may have been times when he had

drugs that would influence him, put him to sleep or something of that kind?

"*A.* Exactly.

"*Q.* But would you consider him during that period mentally competent?

"*A.* I would."

Lawrence G. Matson, an agent of Consumers Power Company, testified as follows:

"I am now accounting supervisor, I was at one time superintendent of security sales. I called on Mr. Chauncey Abraham with reference to the sale of stock. * * * I have known Mr. Chauncey Abraham during his lifetime for a number of years and have also known Mrs. Mary Doster for a number of years. Mr. Abraham had requested at various times for me to take care of his stock transfers for him; this was before Mrs. Mary Doster went there to live. I took care of most any inquiry that Mr. or Mrs. Abraham made of me. * * *

"Mr. Abraham told me he wanted himself taken care of for the rest of his life and he didn't want Mary Doster to work for nothing. * * * We had no discussion about the certificates to be transferred, only that he wanted the stock transferred the way he directed as shown on these stock certificates. The last transfer was ordered in the name of Mary Doster, as I remember it. The name of Mary Doster was filled in on the certificate for five shares, which has been offered in evidence, which appears to have been transferred on January 6, 1941. * * *

"Mary Doster had nothing to do with picking up the stock certificate or filling in the name."

Attorney R. D. Remington, who prepared the mentioned deeds, was unable to be present as a witness, but by agreement between the parties a letter written to Attorney Harry Pell by Attorney Remington

was admitted as evidence, the material part of which reads as follows:

"Whenever I saw Mr. A. (Abraham) he seemed alert and able to state what he wanted done. I recall that because of his age I exercised more than ordinary care to make sure he understood all the details of what he was doing and he appeared to have a complete understanding as to the effect of each transaction. As to the Consumers Power stock I believe the company attorney objected to the form of the papers authorizing transfer but finally made the transfer. You mentioned the farm deed. I believe Mr. A. took particular pains to inquire as to how he could convey the land and reserve a life estate. Don't know what conversation took place between the parties in my absence but they seemed to be getting along O. K. the few times I saw them."

Mary Doster, defendant, called for cross-examination under the statute, [*] testified as follows:

"In relation to the making of the deed and calling Mr. Remington, Mr. Abraham said 'I know now that you will take care of me all the rest of my life, you said you would and I know it, and there is nobody— I owe nobody on this earth,' and then he told what he had done for different relatives and others he had given different things; he had even given his household furnishings away, and he said, 'I want you to have what there is because I know you will take care of me.' Just before that time he asked me to get Mr. Remington and have it fixed because he didn't want things to go as they had talked years before, before he realized that he would live so long. I called Mr. Remington and he came to the house and talked with Mr. Abraham in my presence. Mr. Remington asked Mr. Abraham if he was deeding

[*] See 3 Comp. Laws 1929, § 14220 (Stat. Ann. § 27.915).—RE-PORTER.

this of his own free will and Mr. Abraham told Mr. Remington that he hadn't paid me enough and he knew he couldn't pay me enough and it was in this connection with the conversation with Mr. Remington that Mr. Abraham signed this deed and Mr. Remington took the acknowledgment. The deed was signed on February 21, 1941, and was recorded, but whether I had it recorded or whether I took a trip over here or Mr. Rumble, I can't tell you now."

Reuben Fisher, husband of a niece of deceased, and a witness for plaintiff, testified that he worked in Grand Rapids but had a farm about two miles from Mr. Abraham; that he stopped to see Mr. Abraham practically every week; that "as he grew older his mental condition changed and he got very childish; this condition grew worse as he grew older. Mary Doster told me that he got ideas and did a lot of talking at times." She also said "he was very feeble and that one shouldn't listen to him, * * * that he was having spells in the bedroom; she said he was feeble and that he was getting worse."

Leone Abraham, a witness for plaintiff, had been brought up from childhood by the deceased and his wife; she is the wife of Ola Abraham, a nephew. She testified that Mary Doster had talked with her about Mr. Abraham.

"She spoke to me about his mental condition and said that he had made a will and that it was on record and no matter what he did from then on it wouldn't hold good because he wouldn't be responsible. She said he was childish and forgetful, his mind was not very good at times."

Melvin Mott, a nephew, said that after 1936 his uncle's mental condition grew worse.

Mrs. Bernice Fisher, niece, testified that she and her husband saw deceased about every week-end, and that defendant said, with reference to deceased's

mental condition, that "he was incompetent."

In *Jeffries* v. *Jodawelky*, 304 Mich. 421, one George Jodawelky was involved in an accident between a truck and a pedestrian. Prior to the trial George Jodawelky had made statements to other witnesses which did not harmonize with his statements on the trial of the cause. Counsel for the opposite party urged that a jury question was presented as to which statements he made were a correct version of how the accident happened. We there said:

"In our opinion, the statements given prior to the trial did not rise to the dignity of substantive evidence to present a jury question as to the credibility of the witness and permit them to determine whether or not he was acting within the scope of his employment when the plaintiff was injured."

Under the above authority, the statements of what Mary Doster told plaintiff's witnesses cannot be considered as substantive evidence. Such statements may only be considered in placing a value upon the testimony of defendant. The evidence of witnesses who testified that as deceased grew older his mental condition became worse is a conclusion unsupported by evidence in the record. The testimony of disinterested witnesses clearly shows that considering the age of deceased he was mentally alert. Under the evidence as shown in the record the trial court was not justified in finding as a fact that deceased was not mentally competent to look after his interests. In our opinion the record shows that deceased was mentally competent to understand and know what he was doing when he made the transfers of the property.

It is urged that fraud was perpetrated upon deceased by defendant in getting his property in

her name. It is noticeable that no evidence is pointed out in plaintiff's brief in support of this claim.

In *Mesh* v. *Citrin,* 299 Mich. 527, we said:

"The burden of showing fraud is upon the person alleging it. *John Heidsik Co.* v. *Rechter,* 291 Mich. 708. Fraud is never presumed, *Rossman* v. *Hutchinson,* 289 Mich. 577, nor is it to be lightly inferred. *Richard* v. *Detroit Trust Co.,* 269 Mich. 411."

In our opinion plaintiff has failed to produce substantive evidence of fraud on the part of defendant.

Plaintiff urges that the deed to the farm and the transfer of money and stocks were not outright gifts. No evidence is pointed out by plaintiff to sustain this claim. However, the trial court in his opinion made the following statement:

"The testimony of defendant to the effect that she informed Mr. Abraham from time to time that the funds were getting low or were all gone, in consequence of which he turned over more and more property to her, evidently believing it was necessary to maintain the home, coupled with the attitude of defendant in concealing the transactions from those who had a right to know; her claim that she had bought the farm, together with the difficulty experienced on the hearing of this case in securing from her the facts; all these things lead inevitably to the conclusion that Mr. Abraham did not intend these transfers as gifts at all; but only as necessary sales to provide for living expenses."

The record shows that from 1939 deceased transferred to defendant $2,350 of the Standard Savings & Loan certificates; 57 shares of Consumers Power stock, of the value of $5,700, and $800 from the sale of a part of the farm, together with the farm, of the value of $3,500.

We note that all of the substantive evidence upon this issue is to the effect that defendant was to use what was necessary out of the proceeds of these sales for the maintenance of the home, and the balance was to go to defendant as a gift.

The record clearly indicates that defendant gave very good care to both Mr. and Mrs. Abraham and that Mr. Abraham was desirous of showing his gratitude for the services rendered. The amount she received as gifts during a period of more than eight years of service was of substantial value, but we have in mind that deceased had no children and no one to whom he was under any obligation. Moreover, defendant was not paid regular weekly wages after Mrs. Abraham's death, a period of nearly six years. Deceased had a right to dispose of his property as he saw fit. He cannot be criticized for giving it to one who rendered him a great service.

We are not permitted to make what we think is an equitable distribution of property. We are concerned only with giving effect to the legal acts of deceased. See *Pritchard* v. *Hutton,* 187 Mich. 346.

We have carefully examined the record and the claims of the parties and conclude that the acts of deceased during his lifetime, in so far as the disposal of his property is concerned, were the actions of one free from undue influence or fraud. They represent what he wanted done.

The decree of the trial court is vacated and plaintiff's bill of complaint dismissed. Defendant may recover costs.

Wiest, J., concurred in the result.

.Boyles, J. I do not agree with Mr. Justice Sharpe that statements made by the defendant were inadmissible as substantive proof of the facts admitted.

These statements were admissions against interest by the defendant herself and are therefore substantive proof of the facts admitted. In *Merrill* v. *Leisenring,* 166 Mich. 219, 227, it was said that "such statements are evidence for the adverse party." In *Scheloski* v. *Schricker,* 245 Mich. 391, this court said that the voluntary admissions of the defendant against his interest "are admissible against him as primary evidence." In *Elliotte* v. *Lavier,* 299 Mich. 353, we said:

"Admissions are statements made by or on behalf of a party to the suit in which they are offered which contradict some position assumed by that party in that suit. They are substantive evidence for the adverse party."

However, we have no right to affirm a decree merely on the ground that it "is a just and equitable disposition of the rights and interests of the parties," quoting the language used by Mr. Justice REID. Despite old age, mental deterioration and physical infirmities, one who is mentally competent as a matter of law, and in the absence of fraud or undue influence, has the legal right to control the disposition of his property. Plaintiff has failed to prove that Chauncey F. Abraham was mentally incompetent, or that defendant obtained the property by fraud or undue influence, in the legal and adjudicated meaning of these terms, and for that reason I concur in the result reached by Mr. Justice SHARPE.

STARR, C. J., and NORTH and BUSHNELL, JJ., concurred with BOYLES, J.

REID, J. (*dissenting*). I cannot concur in the opinion of Mr. Justice SHARPE herein.

The trial judge made a very carefully prepared and apparently well-considered finding of facts in

this case and on this appeal we give careful attention to the result of his comparison of the testimony of the various witnesses with each other and the weight that he gives to the testimony. However, we try the case *de novo*.

Mr. Justice SHARPE cites the case of *Jeffries* v. *Jodawelky*, 304 Mich. 421, as authority for disregarding the admissions by defendant herein as substantive proof of facts so stated. In that case the statements of Jodawelky, driver of an automobile concerned in causing an accident, in which he said he was acting in the scope of his employment at the time of the accident, are considered as not competent to bind his employer. That case is not authority for the use sought to be made of it in the opinion of Mr. Justice SHARPE.

In the instant case, Mary Doster had received the title to real estate and to personal property from the decedent, Chauncey F. Abraham, and must be considered, because of being such grantee and assignee of the decedent, as standing upon the proposition that the decedent was competent to make the transfers in question, and that the transfers to her were free from fraud, and that is her defense in this case. She denies that the mind of decedent was so impaired by his age and physical infirmities that he was mentally incompetent. The admissions by Mary Doster, sworn to by witnesses for plaintiff, were receivable not only for the purpose of contradicting her as a witness but to prove the facts about which she spoke. "The admission is original, primary, independent and substantive evidence of the fact covered thereby." 31 C. J. S. p. 1094, citing *Scheloski* v. *Schricker*, 245 Mich. 391, from which case we quote from the syllabus:

"The admissions of a party against his interest are admissible against him, and are presumed to be true until the contrary is shown."

See, also, *Murner* v. *Thorpe,* 284 Mich. 331; *Williams* v. *Wood,* 260 Mich. 322; *Hamilton* v. *Clippert,* 239 Mich. 440; *Fuller* v. *Magatti,* 231 Mich. 213.

On June 5, 1934, defendant Mary Doster, who had done some work as a practical nurse, and who was not related to deceased, Chauncey F. Abraham, was employed to care for Abraham and his wife.

Four witnesses relied on by the defendant to prove the mental competency of the deceased were Dr. Willard R. Vaughn, Mrs. May Huntley, Mrs. Rose Blackman and Mr. Lawrence G. Matson.

Dr. Vaughn testified that decedent was mentally alert during the entire period during which the witness attended him in 1934 to his death in 1942, except when under the influence of drugs. This witness had purchased from Mary Doster 52 shares of stock of the Consumers Power Company that had been owned by decedent and is therefore not a disinterested witness. Mrs. Huntley, who operated a store at Plainwell, testified that decedent was clear in his mind when he called at the store but he did not call there during the period in which it is claimed decedent was mentally incompetent because during that period he stayed at his residence. Mrs. Huntley saw him at his house about September 13, 1942, shortly before he died and says his mind was clear on that occasion but she stayed only a short time because she didn't want to tire him, as he was evidently very feeble. Mrs. Blackman had a conversation with decedent in his back yard as he sat in a chair. That was two or three years before he went to bed. Evidently this occasion was preceding the period when his mentality is disputed. Mr. Matson, superintendent of security sales for the Consumers Power Company, testified that he called at the residence of decedent on three or four occasions, the last visit being January 6, 1941, on the

business of the transfer of the stock by decedent, and claims Mr. Abraham definitely knew what he wanted done. There is no explanation of the coincidence of the presence of Dr. Vaughn at the same time that this witness was present. There is no testimony that the witness was then under the influence of a drug. The inference is fairly to be drawn that the witness felt an interest in the security of Dr. Vaughn in his ownership of the stock. The circuit judge considered the testimony of these various witnesses produced by defendant as not very convincing.

Decedent's wife died February, 1936. Chauncey Abraham died September 30, 1942. The defendant testified:

"I had the account changed to our joint names about December 7, 1935.  *  *  *  After that date I transacted all of Mr. Abraham's business because he wanted me to, it worried him."

In 1936 decedent and defendant took a trip up north and while there the decedent became extremely ill and his friends despaired of his life. Defendant further says in her testimony:

"When I went there Mr. Abraham told me that his stock and income from the stock was to be used for his benefit during his lifetime."

The annual income from the stocks and Standard Savings & Loan was around $500 and $600, as appears from the testimony of defendant. This was about the amount of the annual living expenses of the household.

Decedent was on friendly terms with his relatives.

It further appears from defendant's testimony that the last three years of his life decedent stayed in bed, but sometimes sat by the window, that he had two back injuries and required medicine and doctor's services, and that he sometimes suffered

terribly and required plenty of nembutal.  Defendant further testified:

"I couldn't say it (his mind) was alert, because no one that has had a lot of drugs is alert. * * * I did not consider that the heirs of Mr. Abraham would be interested in how the money would be spent. * * * During the time I was there I had several cars. * * * We had a garden * * * I had chickens for a time * * * and eggs. The groceries would run $5 a week * * * Sometimes the doctor bill would run $50 a year."

In relation to the deed of the house and lot at Plainwell, she testified:

"Mr. Abraham said, 'I know now that you will take care of me all the rest of my life, you said you would.' "

The defendant also stated to at least five witnesses that she had agreed to take care of decedent the rest of his life in consideration of the deed to her of the house and lot at Plainwell. It appears further that the house and lot was free and clear when decedent deeded it to defendant. She says in her testimony:

"I presume I told him (Mr. Elmer Chamberlin) that I had bought the farm from Chauncey Abraham."

It also appears that she told witness Menvil Mott that she had bought that farm.  Her claim therefore in her other testimony that the decedent gave her a gift of it in consideration of services is negatived and the falsity of it made to appear by her own admission in her testimony and by the testimony of these other witnesses.  Defendant testified:

"Q. What did Mr. Abraham say when you told him that the proceeds from the stock had been exhausted?

"*A.* He said, 'How will we live then?'"

Defendant also testified:

"*Q.* And when the proceeds from the disposal of part of it had been exhausted you would tell Mr. Abraham and he would tell you to sell some more of it, would he?

"*A.* That is it."

This testimony is inconsistent with her statement that she bought the Brigham house (not the house hereinbefore spoken of) for $2,500 with money he gave her and also with her testimony she had spent $1,500 on the Plainwell property. Her fraud is proven by her own testimony.

As to the mental incompetency of the deceased, in addition to what she said on the witness stand about the decedent being under the influence of a drug, the defendant told witness Ola Abraham that Mr. Abraham's condition was such that it (decedent's will) couldn't be changed because he would be in no condition to change it because of his mind. Also, to witness Bernice Fisher defendant said that the decedent was "incompetent and incompedient," and to witness Reuben Fisher she said the same thing. Mrs. Leone Abraham testified:

"She spoke to me about his mental condition and said that he made a will and that it was on record and no matter what he did from then on, it wouldn't hold good, because he wouldn't be responsible. She said he was childish and forgetful."

Margaret Fenner testified:

"Mary said that Mr. Abraham was getting too old, he didn't know just what he was doing and he had made a will and it was all settled and we had missed our chance that we didn't go ahead when we should have, that he was getting too old to know just what he wanted."

The finding of the trial judge as set forth in the following excerpt is fully justified and sustained by the greater weight of the evidence, as we view the matter:

"Defendant admits that during the last three and one-half years of his life, Mr. Abraham was confined to his bed; that he suffered a great deal of pain from two back injuries, and that she administered 'nembutal—he used a great deal;' that he was 90 years old at his death. She says that he trusted her absolutely; gave her a power of attorney to transact all his business affairs, and that after she 'took over' she handled all of his money and transacted all of his business; * * * that he furnished the money to purchase all four of the cars, the title of three being put in her name and one in their joint names and furnished the money to keep up the expense of these cars. In view of the hard way in which he had earned his money, and the testimony regarding his frugality, this freedom of expenditure is hardly consistent with his established habits. Moreover, from defendant's testimony, it may well be inferred that Mr. Abraham believed at the time of each transfer that all funds had been used up for living expenses."

Elmer Chamberlin was a friend of the decedent and took care of decedent's business for him before Mary Doster, defendant, came there, and testified that in 1934 decedent had about $14,000 in bonds besides his farm and the house downtown. The account book showing withdrawals between February 1, 1937, and February 26, 1941, together with the testimony as to the actual expenditures in the household, given by defendant, abundantly support and require a conclusion that the actual living expenses in the household during even the last years of the life of decedent were very small, and the standard of living was very frugal. Defendant testified:

"I believe the household expenses while Mr. Abraham was alive ran between $50 and $54 a month."

Practically all of decedent's property had been transferred to defendant before his death. The testimony clearly supports the finding by the trial judge that decedent in making such transfers supposed them to be necessary in order to take care of the living expenses of the household; that the defendant was able by her statements to make him believe that sort of thing casts doubt upon his mental competency.

Defendant testified:

"I agreed to take care of them for $4 a week just for the mornings work. I didn't have to be there afternoons. My arrangements was to get $4 a week until one of them was ill and then it was to be $10. When Chauncey's wife became real ill I got $10 * * * up to the time of her death and for some time afterwards, after he needed care."

Later she testified:

"The money that came in from the sale of shares of stock as they were sold and the cash came in, I just put down on the book that way, as $12 a week for myself, so that some day I would know what I earned."

The arrangements for weekly pay preceded and were superseded by the agreement in pursuance of which decedent deeded defendant the Plainwell house in consideration of which she agreed to care for decedent for the rest of his life, after which time she collected the rent from that house.

The decree appealed from recited and confirmed the conveyance on July 25, 1936, of lot 59, Whitney's addition to the city of Plainwell, to defendant as having been given by decedent and received by defendant as payment in full compensation for defend-

ant's services performed and to be performed in the future by defendant to decedent and recited the remaining property now held by defendant received from decedent, required of plaintiff an accounting, and the decree directed such property to be turned over to or accounted for to the estate of decedent. The findings made by the trial judge are correct and the decree is a just and equitable disposition of the rights and interests of the parties.

The decree appealed from should be affirmed, with costs to plaintiffs.

BUTZEL, J., concurred in the result.